## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

ELEPHANT SHOE, LLC, an :
Ohio Limited Liability Company :
d/b/a WHAT THE HALES$; :
et al. :
  : No.: 1:25-CV-58-RH-ZCB
      Plaintiffs, :
  :
v. :
  :
LYNETTE MICHELLE ALEXIS :
PRESTON; et al. :
  :
      Defendants. : June 2, 2025

## DEFENDANT BRUCE MATZKIN'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Bruce Matzkin respectfully moves the Court to dismiss Counts 5 and 7 of the Plaintiffs' Amended Complaint for failure to state claims upon which relief may be granted. He states in support as follows:

### Background[1]

In *Hales v. Preston, et al.*, 1:24-cv-00045-ZCB, ECF 102 (March 17, 2025) ("*Hales I*"), the Court noted that "every motion or filing in this case

---

[1] All facts recited herein are taken from the Plaintiffs' Amended Complaint as required by the motion to dismiss standard and are, in no way, conceded to be true.

seems to beget another motion or filing." About three weeks prior to the Court making that observation, *Hales I* begat this case. This case is the latest development in a years-long saga that has spawned multiple state court proceedings, a federal lawsuit, and now a second federal lawsuit.

Plaintiffs Elephant Shoe, LLC, and Jeremy Hales allege that they operate a social media business to generate revenue through the publication of an open video diary of Jeremy Hales' life. ECF 35, ¶¶ 1-5. They also sell items that they salvage from storage units. *Id*. at ¶ 6.

The Plaintiffs allege that, in 2020, Defendant Lynette Preston hatched a scheme to get money from him and relocated to Otter Creek, Florida to carry out the scheme. *Id*. at ¶¶ 56-60. Once she moved there, she began to ask Jeremy Hales for help on various matters. *Id*. at ¶¶ 62-73. Hales obliged on several occasions before saying no to requests he deemed unreasonable. *Ibid*.

After Hales began saying no, Preston allegedly began to make defamatory statements about Hales on social media in May 2023. *Id*. at ¶ 77. This kicked off a long saga of legal battles between Preston, John Cook, and Hales that spanned two states and involved multiple social media commentators. *Id*. at ¶¶ 75-97; *see also* ECF 35 *generally*.

2

On March 3, 2024, Jeremy Hales sued Lynette Preston and John Cook in this Court for a variety of claims. *Hales v. Preston, et al.*, 1:24-cv-00045-ZCB. Defendant Bruce Matzkin applied for permission to appear for them *pro hac vice* on September 4, 2024. The Court granted Matzkin's application on September 5, 2024.

The litigation did not proceed smoothly and resulted in bitter and contentious discovery disputes, and it even necessitated the Court supervising the remainder of Jeremy Hales' deposition.

The Plaintiffs subsequently filed this action on February 23, 2025, claiming, among other things, that Matzkin had tortiously interfered with their business relationships through various public comments about the pending legal matters and had been involved in a civil conspiracy with the other defendants in these matters. They filed an amended complaint on April 28, 2025. ECF 35. Further facts will be supplemented below as necessary.

## **Legal Standard**

A Fed. R. Civ. P. 12(b)(6) motion challenges the legal sufficiency of a complaint. To decide it, the Court accepts the factual allegations of the complaint as true and considered whether they are sufficient "to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While detailed factual allegations are not required, bare "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Instead, facial plausibility requires the plaintiffs to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Determining whether a claim is plausible is a "context-specific task" that requires the Court "to draw on its judicial experience and common sense." *Id*. at 679.

Fed. R. Civ. P. 12(d) also recognizes situations where it is appropriate to present matters outside the complaint: "If, on a motion under Rule 12(b)(6)… matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." The Eleventh Circuit, however, has recognized an exception to this rule though and has held that a court may consider documents outside the pleadings without converting the 12(b)(6) motion into a motion for summary judgment if (1) the document is central to the plaintiff's claims and (2) the authenticity of the document is

unchallenged. *See, e.g.*, *Day v. Taylor*, 400 F.3d 1272, 1276 (C.A.11 2005); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (C.A.11 2002).

If the Court treats this motion as one for summary judgment, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Facts are "material" if they form disputes that are not "irrelevant or unnecessary" and may potentially "affect the outcome of the suit." *Id*.

## Argument

### I.    Count 5 fails to state a claim upon which relief may be granted. In the alternative, Matzkin is entitled to summary judgment on it.

"Under Florida law, the elements of tortious interference with a business relationship are (1) the existence of a business relationship[;] (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the

relationship." *Crosswright v. Escambia Community Clinics*, 666 F.Supp.3d 1200, 1209-10 (N.D. Fl. 2023) (cleaned up).

As discussed below, the Plaintiffs' tortious interference fails for the following reasons: (1) the Plaintiffs failed to allege sufficient facts to show business relationships with prospective customers under Florida law; (2) the Plaintiffs fail to allege any facts that show that any of Matzkin's alleged conduct or speech caused a breach in their relationships with any customer; (3) the Plaintiffs fail to plead sufficient facts to show a breach of any relationship with another specific business entity; (4) tortious interference does not exist when an internet platform makes editorial decisions protected by Section 230 of the Communications Decency Act; (5) Matzkin is entitled to a qualified privilege for his statement to Whatnot; (6) Matzkin's statements of opinion and hyperbole are entitled to First Amendment protection and are not actionable; and (7) the Plaintiffs have made themselves public figures for First Amendment purposes and fail to show actual malice.

**A. The Plaintiffs fail to allege sufficient facts to show business relationships with prospective customers under Florida law.**

The Plaintiffs claim that Matzkin's alleged conduct has interfered with customer relationships. ECF 35, ¶¶ 205, 207. They also allege that they have lost profits due to Matzkin's alleged conduct. *Id*. at ¶ 23. They also plead that they are a "social media influencer who uses several online business platforms to generate revenue" through a variety of social media platforms. *Id*. at ¶ 1. Their business model is an "open video diary" of Plaintiff Jeremy Hales' life combined with paid subscriptions to their social media channels and online Whatnot auctions that sell items that they acquire during "Storage Unit hunts." *Id*. at ¶¶ 1-6. The Plaintiffs' amended complaint contains no other allegations that shed light on their customers apart from vague references to subscribers and fans. *See, e.g.*, ECF 35, ¶ 23.

Implicit in these allegations that Matzkin has somehow interfered with their business relationships with prospective customers and fans. But the allegations are insufficient to show the relationship required by Florida law to proceed on this theory.

7

Florida law clearly establishes that "a plaintiff may properly bring a cause of action alleging tortious interference with present or prospective customers but no cause of action exists for tortious interference with a business's relationship to the community at large." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 815 (Fla. 1994). For prospective customers, plaintiffs must allege "a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.*

The inescapable conclusion from the amended complaint's paucity of facts regarding the Plaintiffs' customers, fans, and prospective customers is that the Plaintiffs' prospective customers are the general public that uses the worldwide web and the social media platforms that the Plaintiffs are active on. The Plaintiffs plead no facts that would show the understanding or agreement with prospective customers to enter into a business relationship with them that is required by Florida law. *Ethan Allen, Inc.*, 647 So.2d. at 815.

Thus, the Plaintiffs have failed to show the required business relationship with prospective customers, and all of their claims predicated on this theory must be dismissed.

**B. The Plaintiffs fail to allege any facts that show that any of Matzkin's alleged conduct or speech caused a breach in their relationships with any customer.**

The Plaintiffs claim that Matzkin's alleged conduct and speech has interfered with customer relationships. ECF 35, ¶¶ 205, 207. Their claims, however, are devoid of any supporting factual allegations that show, or would permit an inference to be drawn that, Matzkin's conduct and speech caused a breach in their relationships with any identifiable customer. As such, their claim is fatally deficient under Florida law and should be dismissed.

Florida law requires the Plaintiffs to "prove a business relationship with identifiable customers." *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So.2d 821, 821 (Fla.1996). The Plaintiffs must also allege sufficient facts to show that a breach in the relationship occurred and that the breach in the relationship was caused by Matzkin's conduct. *Crosswright*, 666 F.Supp.3d at 1209-10; *see also* Fla. Pattern Civil Jury Instructions, § 408.6 ("A person interferes with a [business relationship]

9

between two [or more] persons if [he] induces or otherwise causes one of them to terminate the relationship."). The Plaintiffs have not met their burden to allege sufficient facts.

The Plaintiffs' amended complaint is bereft of any allegations identifying any customer who claims to have canceled their subscription to the Plaintiffs' social media platforms because of anything Matzkin said or did. The amended complaint contains no allegations that provide any description that any customer cancelled their subscription to the Plaintiffs' social media platforms because of anything that Matzkin said or did. It alleges nothing to show how many customers did so or how the Plaintiffs even know that they did. It leaves all of those questions open for speculation.

The Plaintiffs claim that Matzkin has caused them $1,229,000 in damages because of his alleged interference, and they predicate that claim on the loss of revenue streams that they would have otherwise retained absent his interference. ECF 35, ¶¶ 204, 208. They do not identify what revenue streams that they lost or what the factual basis for their claim of damages is. In sum, nothing that the Plaintiffs allege provides the Court with any well-pleaded factual basis to conclude that a

breach in any relationship between any customer and the Plaintiffs occurred or that it was fairly attributable to Matzkin's conduct. They leave the Court, and Matzkin, to speculate about it. That speculation is precisely the kind of label and mere legal conclusion that the motion to dismiss standard is designed to prevent. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Florida courts have reinforced the principle that, at the pleading stage, plaintiffs must "identify the customers who were the subject of the alleged interference." *Sarkis v. Pafford Oil Co., Inc.*, 697 So.2d 524, 526 (Fla. Dist. Ct. App. 1997); *see also Bortell v. White Mountains Ins. Group, Ltd.*, 2 So.3d 1041, 1048 (Fla. Dist. Ct. App. 2009).

Matzkin does not suggest that this is a high bar, but it is not too much to ask, at the pleading stage, for the Plaintiffs to identify at least one subscriber or customer who has stopped doing business with the Plaintiffs because of Matzkin's alleged conduct. This is particularly true when the Plaintiffs boast a "subscription fan base of over 730,000 people across the world" just for their YouTube channel and are claiming that Matzkin's alleged tortious interference cost them $1,229,000. ECF 35, ¶ 2. Reason dictates one of two conclusions if the Plaintiffs' allegations are

true. First, Matzkin's alleged tortious interference was so harmful in the aggregate that the Plaintiffs have become inundated with cancelled subscriptions and lost customers who blame Matzkin's alleged interference for ending their relationship with the Plaintiffs. If that is true, then the Plaintiffs should have no problem at all in pleading the identity of at least one such subscriber/customer. Second, if the havoc allegedly wreaked by Matzkin exceeds a million dollars and is not caused by aggregate effect, then the Plaintiffs should have no problem identifying the particular relationship or relationships that ended because of his interference and costs the Plaintiffs that much money.

They have done neither, and, because common sense is a stubborn critic, it points to a third reason. The Plaintiffs cannot identify any relationship with subscribers or customers that they have lost because of Matzkin's alleged tortious interference. Because they cannot, their claim fails.

Additionally, the Court should be incredibly cautious about permitting the Plaintiffs to proceed on their claim since the Defendants are already in the process of showing that the Plaintiffs have selectively crafted their allegations to omit context and facts that contradict their

theories. For instance, Defendant Helms has already shown the Court that the Plaintiffs' selective pleading presented a false statement and was engineered to survive a motion to dismiss by omitting crucial context. ECF 52, pp. 10-14. Matzkin shows below that the Plaintiffs have omitted critical context with respect to the Plaintiffs' allegations as to his contact with Whatnot. *See* Part I.C *infra*. In other words, the Plaintiffs' deliberate choices to omit critical context to nudge meritless claims past a motion to dismiss cast doubt on the reasonableness of inferring that they will be able to identify specific customers at a later stage of this case and show that Matzkin's alleged conduct caused the breach in the relationships.

Thus, the Plaintiffs have failed to plead facts to show an identifiable business relationship with a single current customer that was breached because of Matzkin's alleged conduct, and all of their claims predicated on this theory must be dismissed.

**C. The Plaintiffs fail to plead sufficient facts to show a breach of any relationship with another specific business entity, and they deliberately omitted the context of Matzkin's communications with Whatnot to hide their own attorney's role in provoking Matzkin's comments in the midst of a discovery dispute.**

The Plaintiffs also claim that Matzkin's alleged conduct and speech has interfered with business relationships between them and companies, including Whatnot, Inc. and YouTube. ECF 35, ¶¶ 205, 207. A fair reading of their amended complaint also indicates that they might have additional business relationships with Facebook, TikTok, and Instagram. *Id.* at ¶ 1-6. They explain that they make money through YouTube, Facebook, and TikTok through shared advertising revenue and subscriptions. *Ibid.* They also explain that they make money through Whatnot by using it to host online auctions. *Id.* at ¶ 6.

Their amended complaint, however, is completely bereft of any allegations that show a breach of these relationships, let alone one caused by Matzkin's alleged conduct. They do not allege that YouTube, Facebook, TikTok, and Instagram stopped or restricted them, at any point in time, from publishing content, offering paid subscriptions, advertising products, or engaging in any other use of their platforms – either as a standalone allegation or because of Matzkin's alleged conduct.

14

In fact, a visit to the Plaintiffs' pages on Facebook,[2] YouTube,[3] Instagram,[4] and TikTok[5] shows no interruption and continuous posts[6] throughout the duration of the time period alleged in the complaint. The Plaintiffs allege no facts to show that there was a breach of any kind in their relationships with any of these companies.

What about Whatnot, Inc.? Like the other companies, the Plaintiffs fail to allege any breach in their business relationship with Whatnot, Inc. They simply allege that, on February 17, 2025, Matzkin allegedly contacted Whatnot, Inc. and made false statements to them as part of a malicious conspiracy to damage their business reputation and to interference with their relationship with Whatnot, Inc. ECF 35, ¶ 131. More on that in a moment. The Plaintiffs do not allege that Matzkin's

---

[2] https://www.facebook.com/whatthehales (last checked on May 31, 2025).

[3] https://www.youtube.com/whatthehales (last checked on May 31, 2025).

[4] https://www.instagram.com/whatthehales1/?hl=en (last checked on May 31, 2025).

[5] https://www.tiktok.com/@therealwhatthehales (last checked on May 31, 2025).

[6] The undersigned caveats this statement as to TikTok. The Plaintiffs, like every other TikTok user, were affected by the TikTok shutdown caused by the Protecting Americans from Foreign Adversary Controlled Applications Act in early 2025. *See TikTok, Inc. v. Garland*, 145 S.Ct. 57 (Jan. 17, 2025).

alleged conduct caused a breach in their relationship with Whatnot, Inc. or that Whatnot suspended or otherwise restricted their use of Whatnot to hold online auctions. *Id*. at ¶ 6 (describing how they sell items on Whatnot auctions). Instead, if the Court clicks the link that the Plaintiffs provide to their Whatnot page, *see id*. at ¶ 6, the Court can see that they are still using Whatnot to host auctions and giveaways. In fact, when the undersigned checked on June 1, 2025, the Plaintiffs had 26 auctions and giveaways scheduled for almost every day from June 1 to June 30:



Nothing in the Plaintiffs' amended complaint supplies any facts to support the Plaintiffs' bald accusation that they have been damaged by

the loss of their Whatnot business relationship. ECF 35, ¶ 208. Thus, their claim as to Whatnot is fatally deficient in facts and should be dismissed.

If the Court, however, is inclined to give the Plaintiffs the benefit of an inference, it should think twice about whether such an inference is reasonable. The Plaintiffs selectively plead their allegations about Matzkin's contact with Whatnot to omit the entire context of his communication. The Plaintiffs' version, as pled, paints a picture that Matzkin gratuitously reached out to Whatnot to smear them. ECF 35, ¶ 131. Reality tells a far different story.

On February 17, 2025, during the course of a discovery dispute in *Hales v. Preston*, 1:24-cv-00045-ZCB, Plaintiffs' counsel, Randall Shochet, emailed Whatnot, Inc. about the confidentiality clause in its contract with the Plaintiffs and asked if they would consent to the contract being disclosed to Matzkin – the then-lawyer for Defendants Lynette Preston and John Cook. *See* **Exhibit A – Declaration of Bruce Matzkin, ¶¶ 6-8 & accompanying exhibit.** He copied Matzkin on this email. *Id*. In his email, Shochet made comments that Matzkin viewed as misrepresenting their discussions and unfairly besmirching him to

Whatnot, Inc. *Id*. Matzkin emailed Shochet a forceful response and copied Whatnot, Inc. on it. *Id*. Matzkin's response called Shochet out for discovery misconduct, framed what he perceived as Jeremy Hales' litigation abuses, and invited Whatnot to discuss issues pertaining to *Hales v. Preston*, 1:24-cv-00045-ZCB so as to avoid subpoenas and depositions. *Id*. Shochet responded by accusing Matzkin of attempting to tortiously interfere with the Plaintiffs' business with Whatnot and stating that he considered Matzkin's request to produce the Whatnot contract as withdrawn. *Id*.

Thus, instead of the misleading picture that the Plaintiffs present in paragraph 131 of their amended complaint, the reality is that Matzkin's email comments were part of a discovery dispute in which *the Plaintiffs* had made Whatnot witness to. Matzkin's comments – properly contextualized – are insufficient to support a claim for tortious interference, especially when the Plaintiffs have not, and apparently cannot, allege any breach in their relationship with Whatnot.

Thus, the Court should dismiss Count 5 to the extent that it is predicated on any claim that Matzkin tortiously interfered with the Plaintiffs' business relationships.

18

### D. Tortious interference does not exist when an internet platform makes editorial decisions protected by Section 230 of the Communications Decency Act.

Even assuming that the Plaintiffs state sufficient facts to allege a plausible claim of tortious interference against Matzkin, their claim fails as a matter of law because it seeks to impose liability on Matzkin for editorial decisions for which internet companies enjoy absolute immunity under Section 230 of the Communications Decency Act.

The Southern District of Florida recognized this principle in *Illoominate Media, Inc. v. CAIR Foundation*, 2019 WL 131 68767, at *3 (S.D. Fl. 2019):

> Moreover, even if Plaintiffs had established a business relationship between Loomer and Twitter, Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(b)(1)-(2), insulates internet providers, such as Twitter, from exactly the kind of liability Loomer now seeks to impose upon Defendant. Under the CDA, Twitter cannot be held liable for its decision to exercise traditional editorial functions, such as moderating content on its platform.

*See also* 47 U.S.C. § 230(e)(3). The court recognized that, even if the defendants had persuaded Twitter to ban journalist Laura Loomer's account, § 230 does not permit "end-run[s]" around the Communications Decency Act's "explicit prohibition that Twitter cannot be held liable for its decision to moderate content on its platform." *Id*. Thus, the court held

19

that § 230 barred Loomer's tortious interference claim against the CAIR Foundation for attempting to convince Twitter to ban Loomer. *Id*.

This principle applies in this case. The Plaintiffs accuse Matzkin of interfering with their relationships with Facebook, YouTube, Instagram, TikTok, and Whatnot. They ignore that any curtailment of their ability to publish or distribute content on any of these platforms would fall squarely within those platforms' editorial discretion to enforce their terms of service and the content permitted on their platform. § 230 affords the platforms absolute immunity to make those editorial decisions. Allowing the Plaintiffs to proceed on a tortious interference claim that sounds in a classic editorial function would create the exact "end-run" that *Illoominate Media, Inc.* found impermissible.

The Court should not permit it and dismiss the Plaintiffs' tortious interference claims insofar as they pertain to the Plaintiffs' claims of relationships with Facebook, YouTube, Instagram, TikTok, and Whatnot.

### E. Matzkin is entitled to a qualified privilege for his statement to Whatnot.

Florida law recognizes a qualified privilege for attorneys who make statements during "ex-parte, out-of-court questioning of a potential nonparty witness in the course of investigating a pending lawsuit if those

statements are [] connected with or related to the subject of inquiry…."
*DelMonico v. Traynor*, 116 So.3d 1205, 1219 (Fla. 2013), *abrogated on other grounds by Askew v. Florida Department of Children and Families*, 385 So.3d 1034 (Fla. 2024).

> The issue of whether a statement is connected with or related
> to the subject of inquiry is a threshold determination to be
> made by a judge, mindful that much latitude must be allowed
> to the judgment and discretion of those who maintain a cause
> in court when determining what is pertinent.

*Id*. at 1219 (cleaned up). As a general rule though, the statements are privileged "*so long as the act has some relation to the proceeding*." *Id*. at 1219 (cleaned up). Once a defendant shows that the statements are related to the subject of inquiry, the plaintiffs prove "express malice" – "that the defendant's primary motive in making the statements was the intent to injure the reputation of the plaintiff." *Id*. at 1219-20 (cleaned up).

In this case, there is no question that Matzkin was an attorney representing Lynette Preston and John Cook in *Hales v. Preston*, 1:24-cv-00045-ZCB. There is also no question that Matzkin made his comments while communicating with Whatnot about a discovery dispute in which Whatnot was a non-party witness. **Exhibit A, ¶¶ 6-8 & accompanying**

**exhibit.** There is also no meaningful dispute that Matzkin's comments were directed at addressing what he perceived as Attorney Shochet's besmirching of him. *Id*. There is also no meaningful dispute that Matzkin invited Whatnot to contact him to informally investigate pertaining to *Hales v. Preston*, 1:24-cv-00045-ZCB so as to avoid subpoenas and depositions. *Id*.

The context that Matzkin supplied about what he perceived as Attorney Shochet's misleading communication to Whatnot was highly relevant to the inquiry that he ultimately framed for Whatnot about critical issues in *Hales v. Preston*, 1:24-cv-00045-ZCB. It served to show Whatnot why two strangers were suddenly have a heated discovery argument in its email inbox about a contract, and it placed Whatnot on notice that it should proceed cautiously. All of that was highly relevant to Matzkin's approach to dealing with Whatnot, particularly in light of the tone that Attorney Shochet set for the interaction. Thus, Matzkin has shown that his statements were made in the course of investigating a non-party's testimony and were relevant to the inquiry at hand.

The Plaintiffs plead no facts to show that Matzkin's primary motive was an intent to injure the Plaintiffs' reputations. Instead, they omit the

entire context of the email discussion to frame the statement as a gratuitous attempt to injure the Plaintiffs. They hide from the Court that they initiated the conversation in Whatnot's inbox, that Matzkin very clearly responded to what he perceived as their counsel's mudslinging, and that his response very clearly was directed at responding to Attorney Shochet. Nothing about that context supports any inference that Matzkin acted with "express malice."

Thus, the Court should find that the Plaintiffs have failed to allege sufficient facts to overcome Matzkin's qualified privilege and dismiss Count Five.

## F. Matzkin's statements of opinion and hyperbole are entitled to First Amendment protection and are not actionable.

The First Amendment "provides protection for rhetorical hyperbole that cannot reasonably be interpreted as stating actual facts about an individual." *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002) (cleaned up). This rule "provides assurance that public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of our Nation." *Id*. (cleaned up)

It also "reflects the reality that exaggeration and non-literal commentary have become an integral part of social discourse." *Id.* (cleaned up).

To determine whether a statement is protected rhetorical hyperbole, the Eleventh Circuit has instructed courts to "consider the circumstances in which the statement was expressed." *Id.* at 702. Courts typically look for "the sort of loose, figurative language that no reasonable person would believe presented facts." *Id.*

*Horsley* itself sheds some light on where the line is. On a TV talk show, a pro-life advocate accused TV host Geraldo Rivera of being an accomplice to the homicide of aborted babies in the United States. *Id.* at 699. The Eleventh Circuit held that the accusation was protected hyperbole because it was figurative, not literal. *Id.* at 702.

Likewise, the First Amendment protects statements of pure opinion. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Florida law establishes that a "pure opinion" exists "when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Id.* "Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the

plaintiff or his conduct that have not been stated in the publication or assumed to exist by the parties to the communication." *Id*. Courts should also consider "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct." *Id*. at 1263 (cleaned up).

*Turner* provides some guidance as to where this line is. It considered statements by a law firm in a report investigating Miami Dolphins personnel for their involvement in a hazing scandal. For instance, *Turner* found that a statement that Coach James Turner participated in "homophobic taunting" of a player was an opinion because it was a subjective assessment of Coach Turner's conduct and could not readily be proven true or false. *Id*. at 1264.

In this case, the Plaintiffs have alleged that a slew of comments made by Matzkin are false and actionable. Those statements include:

- "Jeremy Hales gave me a nickname with an 'anti-semitic (sic0 tinge;" ECF 35, ¶ 132.

- "Jeremy Hales storylines involving the neighbors (his clients) are 'fake.'" *Id*.

- "Fox and That Umbrella Guy profit from Hales' cyberstalking, under the guise of 'journalism.'" *Id*.

- "Jeremy Hales is a 'public stalker of private victims.'" *Id*.

- "Jeremy Hales has fabricated storylines using innocent, powerless peoples' lives to sell as entertainment for profit." *Id*.

- "I can't say how I heard, but rumor is JH has only one testicle." *Id*. at ¶ 133.

- "What's the source of this 'JH has one testicle' thing?" *Id*.

- "Jeremy Hales is a 'homophobe who's going around on video you know threatening people and calling them such names." *Id*. at ¶ 135.

- "Jeremy Hales is a 'psychopath douchebag.'"

- "Jeremy Hales' daily mission is "to come up with 45 minutes of vitriol and name calling and defamation and incitement of people whom he knows you know love him and and (sic) do whatever he wants or feel or believe whatever he tells them to uh (sic) and uses that power and that platform to literally co-opt lives of private people and and (sic) cause them uh (sic) nothing but uh (sic) harassment and and (sic) threats and

26

Terror and strangers uh (sic) you know invading their their (sic) peace and their space and their lives." *Id*. at ¶ 135.

Each of these statements – regardless of whether they are distasteful to Hales or anyone else – is a statement of Matzkin's opinion of the Plaintiffs and their conduct. Others – such as Matzkin's "testicle" comment – are hyperbolic irony that express Matzkin's opinion as to just weak the Plaintiffs have acted by becoming enamored with his clients.

All the discovery in the world will yield nothing that will prove them true or false because they are unquestionably Matzkin's opinions. As such, the First Amendment prevents the Plaintiffs from making them actionable and requires the dismissal of any claims predicated on them.

### G. The Plaintiffs have made themselves public figures for First Amendment purposes and fail to allege facts to show that Matzkin spoke with actual malice.

The First Amendment mandates a distinction between "private individuals" and "public figures" in state tort actions. *Mile Marker, Inc. v. Petersen Publishing, LLC*, 811 So.2d 841, 845 (Fla. 2002). In state tort actions alleging false statements, "public figures" must show that the statements were made with actual malice. *Turner*, 879 F.3d at 1273. Thus, at the pleading stage, "public figure" plaintiffs "must allege facts

sufficient to give rise to a reasonable inference that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 1273 (cleaned up).

*Turner* held that, when a plaintiff chooses to put himself in the public arena, he makes himself a "public figure." *Id.* at 1272 (recounting how Coach Turner participated in TV shows and interviews that showcased his coaching style and coaching philosophy."). This is particularly true when a plaintiff plays a prominent role in a public legal dispute. *See Friedgood v. Peters Pub. Co.*, 521 So.2d 236, 240 (Fla. Dist. Ct. App. 1988).

"Public figures" fall into two categories: "general" or "limited." *Turner*, 879 F.3d at 1272. "General public figures are individuals who, by reason of fame or notoriety in a community, will in all cases be required to prove actual malice." *Id.* at 1272. "Limited public figures, on the other hand, are individuals who have thrust themselves forward in a particular public controversy and are therefore required to prove actual malice only in regard to certain issues." *Id.* at 1272.

Matzkin submits that the Plaintiffs have made themselves "general public figures." The Plaintiffs have alleged that their business is centered

28

around an "open video diary" of Jeremy Hales' life. ECF 35, ¶ 5. They have also alleged that their efforts to promote this "open video diary" of Hales' life have gained them over 730,000 YouTube subscribers and 327,000 Facebook followers. *Id.* at ¶¶ 2-3. In sum, they have placed their lives in the public sphere and have amassed a sizeable and lucrative following because of it. As such, they must allege actual malice "in all cases."

Assuming *arguendo* that the Court disagrees, the Plaintiffs are still "limited public figures." Courts apply a two-part test to determine whether someone is a limited public figure for purposes of a specific controversy. "First, the court must determine whether the individual played a central role in the controversy." *Turner*, 879 F.3d at 1273. "Second, it must determine whether the alleged defamation was germane to the individual's role in the controversy." *Id.*

There is no question that the Plaintiffs meet both aspects of this test. The Court may take judicial notice that Plaintiff Jeremy Hales has been one of the central parties of a years-long public dispute with Lynette Preston and John Cook that has bred court case after court case. *See, e.g.*, *Hales v. Preston*, 1:24-cv-00045-ZCB. The Plaintiffs also allege that they

themselves have publicized the dispute and their own legal actions. ECF 35, ¶ 84. Throughout their complaint, they have alleged that Jeremy Hales' life and his participation in litigation with John Cook and Lynette Preston has resulted in a substantial amount of discussion of his life by other YouTube personalities. *See* ECF 35 *generally*. In other words, there is no question that there is a very public controversy between the Plaintiffs and other people and that the Plaintiffs have been co-stars in the legal drama.

All of Matzkin's comments – as alleged by the Plaintiffs – have all been directed at the Plaintiffs' role in their ongoing legal battles with Lynette Preston and John Cook. The Plaintiffs provide no factual allegations to show otherwise. Thus, there is no question that Matzkin's comments were germane to the public controversies involving the Plaintiffs. Thus, the Court should find that the Plaintiffs must allege actual malice.

The Plaintiffs have alleged no facts to show that Matzkin knew his comments were false or that he spoke with reckless disregard for whether his comments were false. They have also not alleged any facts that would permit the Court to draw a reasonable inference that Matzkin knew that

his commentary was false or that he spoke with reckless disregard for the truth. Instead, their allegations point to a zealous attorney seeking to counter the Plaintiffs' public onslaught against his clients based on the information available to him.

Simply put, the Plaintiffs fail to allege the facts necessary to show actual malice, and Count 5 must be dismissed as a result.

## II. Count 7 fails to state a claim upon which relief may be granted. In the alternative, Matzkin is entitled to summary judgment on it.

The Plaintiffs' apparent theory of civil conspiracy as it relates to Matzkin would destroy the sanctity of attorney-client relationships if allowed to proceed. Both Eleventh Circuit and Florida precedent strongly counsel against allowing it to proceed. The Plaintiffs have also failed to allege sufficient facts to either show a conspiracy or allow reasonable inferences of a conspiracy to be drawn.

Under Florida law, a civil conspiracy "is not a separate or independent tort but is a vehicle for impute the tortuous [sic] actions of one co-conspirator to another." *Hoch v. Rissman, Weisberg, Barrett*, 742 So.2d 451, 460 (Fla. 5th DCA 1999). Thus, an actionable civil conspiracy claim "must be based on an existing independent wrong or tort that

would constitute a valid cause of action if committed by one actor. *Williams Elec. Co. v. Honeywell, Inc.*, 772 F. Supp. 1225, 1239 (N.D. Fla. 1991) (collecting cases).

The Plaintiffs must allege the following elements: "(a) a conspiracy between two or more parties; (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Walters v. Blankenship*, 931 So.2d 137, 140 (Fla. 5th DCA 2006). This requires "[a]n express or implied agreement of two or more persons to engage in a criminal or unlawful act." *Gilison v. Flagler Bank*, 303 So.3d 999, 1004 (Fla. 4th DCA 2020). Thus, a conspirator must "know of the scheme and assist in it in some way…." *Id.*

## A. Eleventh Circuit and Florida precedent bar civil conspiracy claims against attorneys acting within the scope of an attorney-client relationship.

*Farese v. Scherer*, 342 F.3d 1223 (11th Cir. 2003) established, in the context of a 42 U.S.C. § 1985 claim against an attorney, attorneys cannot not be made liable under a conspiracy theory. The Eleventh Circuit held that, "as long as an attorney's conduct falls within the scope of the representation of his client, such conduct is immune from an allegation

of a § 1985 conspiracy." *Farese*, 342 F.3d at 1232. *Farese* stated that this

immunity is broad and even encompasses attorney conduct prohibited by

ethical rules. *Id*. at 1231. In adopting this rule, the Eleventh Circuit

noted that the practice of law invokes different considerations than those

posed by the intracorporate-conspiracy doctrine. *Id*. at 1232 n.10. The

Eleventh Circuit did not expand on those considerations, but the

attorney-client privilege and the public interest in preserving zealous

representation for litigants undoubtedly necessitate the stronger rule

that it adopted.

Florida precedent recognizes a similar rule. "Extreme caution

should be exercised when an attempt is made to hold an attorney liable

for a wrong committed by his client by way of a civil conspiracy cause of

action." *Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So.2d 949, 951

(Fla. 3rd DCA 1984). *Blatt* explained the rationale as follows:

> It is recognized that an attorney acting under employment, at
> the direction of his client and in [a] legal manner is not liable
> for the consequences of his client's actions. [citations omitted]
> Thus, the question now before us is whether there is sufficient
> evidence in the record upon which the jury could find that [the
> attorney] acted illegally or beyond his employment in order to
> secure an unconscionable advantage against the [plaintiff].
> The action of an attorney in a lawsuit frequently angers his
> client's opponent because the attorney by his energy often
> must advance his client's cause at the expense of the

opponent. It is not infrequent that persons who have lost a lawsuit because of actions undertaken by an attorney on behalf of his client, feel that they have been unjustly dealt with by the attorney. Such results are one of the unfortunate byproducts of the adversary system before the courts. Nevertheless, the advantages of the adversary system in securing a full disclosure of the facts to the courts is such that we must accept its disadvantages.

*Id.* at 952 (quoting *Pickard v. Maritime Holding Corp.*, 161 So.2d 239, 241 (Fla. 3d DCA 1964)).

In this case, the Plaintiffs' allegations break down into two categories. First, they allege a small number of facts about Matzkin's comments prior to his retention by Lynette Preston. ECF 35, ¶¶ 124-26. Most of these allegations are conclusory statements about Matzkin joining a plan hatched by Preston and Cook to take down the Plaintiffs. *Id.* at ¶ 125. They also contain an allegation that Matzkin sent an email on March 11, 2024 offering to comment on the Plaintiffs' matters with Lynette Preston and also offering anecdotes from his experience in practicing law. *Id.* at ¶ 126.

The second category of allegations all pertain to Matzkin's conduct after Lynette Preston retained him on March 27, 2024. **Exhibit A, ¶¶ 2-3**. Preston retained Matzkin as a legal consultant to locate legal counsel for her in Florida and Ohio, educate her on federal civil procedure, and

34

assist her in countering the public onslaught of online bullying, targeting, and false statements against her by the Plaintiffs. **Exhibit A, ¶¶ 2-3**.

Thereafter, Matzkin operated solely within what he was retained to do. He assisted Preston in attempting to locate legal counsel, and he began to publicly counter the narrative that the Defendants promulgated through their social media platforms about how righteous they were and how crazy and evil Preston was. Matzkin also countered the commentary from social media legal commentators about how much the legal deck was stacked against Preston. Matzkin then appeared for Preston and John Cook in *Hales v. Preston, et al.*, 1:24-cv-00045-ZCB on September 5, 2024 after he realized that he did not need local counsel to appear *pro hac vice* in the Northern District of Florida. **Exhibit A, ¶ 4.**

Everything that Matzkin did was within the scope of his representation of Preston. Thus, Eleventh Circuit and Florida precedent bar the civil conspiracy claim against him.

**B. The Plaintiffs do not plead sufficient facts to show a violation of the Lanham Act or an agreement to violate it between Matzkin and anyone else.**

To state a Lanham Act false advertising claim, the Plaintiffs must show "(1) the ads of the opposing party were false or misleading, (2) the

ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been… injured as a result of the false advertising." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). Because they do not allege that Matzkin independently committed the violation, the Plaintiffs must show an agreement between him and someone else to violate the Lanham Act and assisted in it in some way. They do not.

Nothing that the Plaintiffs allege shows that Matzkin had any knowledge of a scheme to engage in false commercial advertising or promotion. Despite all of the allegations leveled against his co-defendants, nothing indicates that Matzkin knew or assisted in any scheme to engage in false commercial advertising or promotion. At best, the Plaintiffs allege that Matzkin supplied information to Defendant Weeks about a deposition of Jeremy Hales, but that falls far short of knowing of a conspiracy to commit false advertising or assisting in it. ECF 35, ¶ 49. Of all the allegations against Defendant Weeks, the

Plaintiffs do not implicate Matzkin in any part of the alleged scheme by Weeks to solicit money. *Id.* at ¶¶ 50-55.

That is simply not enough, and the Court should dismiss the Plaintiffs' civil conspiracy claim against Matzkin to the extent it is predicated on a Lanham Act violation.

### C. The Plaintiffs fail to state a violation of the Florida Deceptive and Unfair Trade Practices Act or an agreement to violate it between Matzkin and anyone else.

The Plaintiffs must show "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages" to succeed on a FDUTPA claim. *Rollins v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). "A deceptive practice is one that is likely to mislead consumers, and an unfair practice is one that offends established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007).

As with the Lanham Act claims, the Plaintiffs fail to show any commercial activity here or that Matzkin knew about a scheme to engage in an unfair or deceptive trade practice, agreed to it, and assisted it in any way.

As discussed at length previously, the Plaintiffs also fail to show any actual damages from the alleged conspiracy to violate FDUPTA – a indispensable element of a FDUPTA claim. *See Smith v. 2001 South Dixie Highway, Inc.*, 872 So. 2d 993, 994 (Fla. 4th DCA 2004).

Thus, the Court should dismiss their civil conspiracy claim against Matzkin to the extent it is predicated on a FDUPTA violation.

**D. The Plaintiffs fail to state a claim for tortious interference or an agreement to commit it between Matzkin and anyone else.**

Matzkin will not set forth again all of his arguments above as to why the Plaintiffs have failed to state a tortious interference claim. Suffice it to say, those arguments apply with equal force to all of the Plaintiffs.

What Matzkin will take a moment to address is the Plaintiffs' fixation with Matzkin's comment about creating an "Anti [What The Hales] media ecosystem." ECF 35, ¶ 129. The Plaintiffs parlay this one comment into evidence of a fantastical conspiracy to destroy them, but their claims ignore basic First Amendment principles.

A foundational First Amendment principle is that "[t]he remedy for speech that is false is speech that is true. This is the ordinary course

in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *United States v. Alvarez*, 567 U.S. 709, 727 (2012). In other words, if a person does not like certain speech, "the remedy to be applied is more speech…." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

This principle walks side-by-side with the First Amendment right to associate with others for the purpose of communicating ideas and viewpoints. *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984).

Matzkin's comment is in line with these principles. As his declaration indicates, he saw what he perceived to be an onslaught of distasteful, cyberbullying carried on by the Plaintiffs toward his clients, and he responded by injecting the counter-viewpoint into the marketplace of ideas. **Exhibit A, ¶¶ 2-3.** His comment about creating an "Anti [What The Hales] media ecosystem" spoke to nothing more than creating a place in the marketplace of ideas for Preston's side of the story about her dispute with the Plaintiffs.

To infer from that statement that Matzkin was building a conspiracy or referring to one would betray the First Amendment's

protections for "more speech." The Court should reject that invitation and require the Plaintiffs to plead more facts evidencing a conspiracy to commit an unlawful act than a simple comment that refers to the First Amendment's promises regarding the marketplace of ideas. Because they have not plead those facts, the Court should dismiss Count 7 against Matzkin.

## Conclusion

For the foregoing reasons, the Defendant, Bruce Matzkin, respectfully requests that the Court grant his motion to dismiss Counts 5 and 7 for failure to state a claim upon which relief can be granted.

The Defendant, Bruce Matzkin

By: /s/ Cameron L. Atkinson
Cameron L. Atkinson
    *Pro hac vice*
ATKINSON LAW, LLC
122 Litchfield Rd, Ste. 2
P.O. Box 340
Harwinton, CT 06791
Tel: 203-677-0782
Fax: 203-672-6551
catkinson@atkinsonlawfirm.com

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(B), Plaintiffs' counsel and counsel for Bruce Matzkin conferred by email and phone from May 29, 2025 to June 2, 2025 to discuss this Motion and the parties were not able to resolve the issues contained herein.

/s/ Cameron L. Atkinson

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document complies with the applicable word count limit requirements of Local Rule 7.1. The word count is 7984 words as calculated by the word-processing system.

<u>/s/ Cameron L. Atkinson</u>