UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JEREMY BRYAN HALES, et al.,
Plaintiffs,

v.

Case No.: 1:25cv58/RH/ZCB

JOHN COOK, et al., Defendants.
/

## DEFENDANT LEE'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT – TO SUBSTITUTE PARTY

COMES NOW, Defendant Lee respectfully submits this opposition to Plaintiffs' Motion for Leave to Amend Complaint – To Substitute Party (Doc. 63), and states as follows:

## INTRODUCTION

This lawsuit is not a genuine pursuit of justice—it is yet another episode in Jeremy Hales' ongoing campaign to manufacture controversy, cultivate outrage, and monetize conflict for the benefit of his YouTube channel. Hales, a self-styled content creator, has made a practice of instigating public disputes, recorded selectively edited encounters, and then casting himself as the perennial victim before a large and devoted online audience. His pattern is clear: provoke, record, and then profit—



FILED USDC FLND GU
JUN 17'25 AM11:00

using the legal process as a mere backdrop for generating attention and financial support.

The Defendants in this case are not malicious conspirators; they are independent online commentators and critics who, like Hales himself, participate in the robust and often heated public discourse that thrives on social media platforms. Their statements, cited in Hales' Amended Complaint, are plainly matters of opinion, satire, or rhetorical hyperbole—well within the norms of the YouTube community and First Amendment protections. Hales' true motive is not to vindicate his reputation, but to silence criticism, control the narrative, and stoke the outrage that drives clicks and donations from his online following.

Recent events underscore this pattern. When a retired attorney and mother of four merely gave an interview to someone critical of Hales, she became the target of a coordinated harassment campaign by Hales and his followers—prompted and celebrated on his channel. When she responded with satirical content exposing the truth, Hales spun the story, presenting himself as the aggrieved party and again mobilizing his audience against her.

The litigation before this Court is no different. Hales has weaponized the court system, turning legal filings into fodder for his videos, all while soliciting and receiving tens of thousands of dollars in donations under the guise of defending

himself from "attacks." This is not the conduct of a wronged individual seeking justice—it is the calculated strategy of a digital provocateur exploiting the legal system for views, influence, and profit.

For these reasons, the Court should view Hales' claims with the skepticism warranted when the legal process is conscripted as a stage prop for online entertainment, rather than a forum for the resolution of legitimate grievances.

This is not conclusive to this case, but also others in Florida are experiencing Plaintiff Hales conduct as stated by Plaintiff Ferderigos against Defendant Hales in Case No. 2025-CA-004528 [Exhibit A: Lawsuit]

Plaintiff, Leslie Ferderigos states in her 2nd amended complaint the following:

1. Defendants are misleading the public while presenting themselves as advocates for transparency and truth. Defendant Hales has orchestrated a concerted scheme designed to manipulate viewership analytics, silence dissent, and financially benefit those who participate in his campaign. This operation is not a matter of speculation—it is a calculated effort that rewards loyalty to Hales with inflated followers, increased visibility, and monetary compensation, while punishing those who refuse to participate.

2. Data analysis shows that creators who align themselves with Hales, including Megan Fox, "That Umbrella Guy," and Jay Hipp, have experienced dramatic spikes in their online metrics soon after joining his circle and promoting his narrative. This is not mere coincidence. The evidence indicates that these creators have been incentivized to support Hales' agenda and, in return, have reaped significant online and financial benefits. Those who decline to participate or who attempt to expose the scheme have faced targeted harassment, defamation, and orchestrated attacks intended to damage their reputations and silence their voices.

3. This pattern of behavior extends beyond simple online rivalry. It constitutes a systematic campaign to manipulate public opinion and stifle free expression. The coordinated use of fake accounts, cyber harassment, and intimidation tactics demonstrates an intention to suppress dissent and maintain control over the narrative. The goal is not just personal profit, but the creation of an environment where truth-telling is punished and misinformation is rewarded.

4. The consequences of this scheme are far-reaching. When public discourse is subject to manipulation through coordinated misinformation and intimidation, the integrity of online platforms—and by extension, the rights of individuals to express themselves freely—is fundamentally undermined. This is not

merely "YouTube drama"; it is a matter of public concern that warrants legal scrutiny and redress.

5. Evidence supporting these claims includes timelines, digital communications, and analytics data that clearly illustrate the existence and operation of this scheme. While some material is reserved for ongoing litigation, the available public evidence is sufficient to establish a pattern of conduct that is both deliberate and damaging. The public deserves transparency, and those responsible for orchestrating and benefiting from such schemes must be held accountable.

6. It is essential for the court to recognize the seriousness of this conduct and its impact on both individuals and the broader public. Only through legal action can we ensure that those who manipulate, intimidate, and profit at the expense of honest discourse are brought to justice. The pursuit of truth and the protection of free expression depend on the willingness to expose and address such schemes wherever they appear.

7. Plaintiffs seek to file a second amended complaint to substitute "Raymond G. Bonebrake, Jr." for the previously unidentified "John Doe." While Federal Rule of Civil Procedure 15(a) allows courts to freely grant leave to amend, this is not an absolute right—leave may be denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed undue prejudice to the opposing party, or futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962); Campbell v. Emory Clinic, 166 F.3d 1157, 1162 (11th Cir. 1999).

## ARGUMENT

### A. Plaintiffs Have Exceeded the Service Deadline

Plaintiffs had 90 days from the filing of the original complaint to serve the 10 out of 11 named defendants. It has now been 113 days since the complaint was filed. Under Rule 4(m), "[i]f a plaintiff fails to serve a defendant within the 90-day period, the district court must dismiss the action without prejudice as to that defendant or order that service be made within a specified time." Lepone-Dempsey v. Carroll County Comm'rs, 476 F.3d 1277, 1281 (11th Cir. 2007). Plaintiffs' failure to timely serve all defendants raises concerns about their diligence and compliance with the Federal Rules of Civil Procedure.

### B. Ray's Contact Information Was Always Available and Service Has Been Made

Raymond G. Bonebrake, Jr.'s contact information was listed in the complaint from the outset. Service has already been filed on the docket for Ray, rendering any argument about the need for unnecessary substitution. Notably, Plaintiffs filed this motion without requesting an extension of time to serve Ray or the other three defendants, further undermining any claim that

amendment is necessary or justified at this late stage. If Ray is properly served, he (or his counsel) can request to have his name corrected on the docket. Alternatively, Plaintiffs' counsel can move to correct the name, as was permitted earlier in this case.

## C. Ray's Background, the Character of this Lawsuit and Lack of Personal Jurisdiction

Raymond G. Bonebrake, Jr. is an 80-year-old disabled veteran who suffers from COPD and other health concerns, and who fought for his own rights and the rights of all Americans. To add him to this frivolous lawsuit, which appears designed less to seek justice and more to silence anyone who differs in opinion from Mr. Hales and his use of a YouTube channel to destroy reputation is wrong. This lawsuit has not only caused needless harm to those it targets but has also made a mockery of the federal court system by turning it into a personal stage for profit and spectacle. Federal courts are not meant to be used as tools for intimidation or entertainment.

Florida does not have personal jurisdiction over Raymond G. Bonebrake, Jr., as he is not a resident of Florida and has no meaningful contacts with this state that would subject him to jurisdiction here. See Licciardello v. Lovelady, 544 F.3d 1280, 1284 (11th Cir. 2008) (personal jurisdiction requires that a

defendant have minimum contact with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice). Adding Ray as a defendant under these circumstances would be improper and subject him to unnecessary hardship.

## D. Plaintiffs' Abuse of the Legal Process and Stall Tactics Against Anti-SLAPP Motion

Jeremy Hales has made it clear—even on his own YouTube channel—that he does not take people to court to win on the merits, but to bankrupt those who oppose him. As recently as last week, after a zoom hearing before Magistrate Bolitho on a related case, Mr. Hales publicly stated that he has no intention of mediating and that the only way he will settle is if Defendants Preston and Cook leave Otter Creek, FL and sign everything they own over to him. This further demonstrates that his true aim is not justice, but to obtain property he was unable to acquire himself and to punish those with whom he disagrees.

Moreover, Defendant Lee believes this motion to amend is a transparent stall tactic, designed to delay the Court's consideration of the pending anti-SLAPP motion which by law is supposed to be handled expeditiously. Plaintiffs' repeated amendments and procedural maneuvers in this case and a related case are not only a waste of judicial resources but also hold defendants' lives hostage by prolonging litigation and chilling their right to free speech. Courts

in this Circuit have recognized their inherent authority to prevent abuse of the

judicial process. See Attwood v. Singletary, 105 F.3d 610, 613 (11th Cir.

1997).

## E. Concerns About Plaintiffs' Motives for Amendment

This is Plaintiffs' second attempt to amend their complaint. Given the

timing—after motions to dismiss and anti-SLAPP motion have already been

filed, Defendant Lee is concerned that Plaintiffs are using this amendment as

an opportunity to add new allegations or state claims based on recent motions

to dismiss or parties beyond simply substituting Ray. Courts routinely deny

leave to amend where the amendment is sought for strategic reasons or to

circumvent pending motions, especially when it would cause undue delay or

prejudice. See Maynard v. Bd. of Regents of the Div. of Univs. of Fla. Dept.

of Educ., 342 F.3d 1281, 1287 (11th Cir. 2003); Wagner v. Daewoo Heavy

Industries America Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc).

When a plaintiff seeks to substitute a defendant after the statute of limitations

has run, the amendment may only relate back if the requirements of Rule 15(c)

are satisfied, including notice to the defendant and that the failure to name the

proper party was due to a mistake. See Makro Capital of Am., Inc. v. UBS AG,

543 F.3d 1254, 1259 (11th Cir. 2008); Cliff v. Payco

Gen. Am. Credits, Inc., 363 F.3d 1113, 1131 (11th Cir. 2004).

### F. Prejudice and Futility

Allowing further amendment at this stage, especially after the service window has

closed and with dispositive motions pending, would prejudice Defendant Lee and

impose unnecessary delay. Plaintiffs have not shown that the claims against Ray

relate back under Rule 15(c), nor have they provided a proposed amended

complaint as required by local rules. See Wagner, 314 F.3d at 542 (affirming

district court's discretion to deny leave to amend when amendment is futile or

would cause undue delay or prejudice).

Counsel for Plaintiff, Randy Shochet, has Defendant Lee listed in Doc 58 on his

service list. Defendant Lee has not received this document via email or USPS. Mr.

Shochet has two emails with which to contact Defendant Lee and has not used

them.

In Doc 63, counsel for Plaintiff states a Certificate of Good Faith Conference,

claiming to have conferred but unable to completely resolve the

issues        presented        in        the        motion,        as        follows:

*"Pursuant to Local Rule 7.1, I hereby certify that counsel for the movant has*

*conferred with all parties or non-parties who may be affected by the relief*

*sought in this motion in a good faith effort to resolve the issues and Defendants*

*MATZKIN and HELM have no objection to this Motion but as to Defendants*

*LEE, PRESTON, COOK, and HUGHES the undersigned has been*

*unable     to     resolve     the     issues."* This information is false. Randy

Shochet has NOT contacted Defendant Lee to confer via email or USPS.

Additionally, on Doc 63, Defendant Lee is listed on his service list and has not

received any document related to this case from Plaintiff's counsel.

Defendant Lee respectfully requests that the Court take notice that the only contact

with Mr. Shochet was his response to Defendant Lee's inquiry about agreeing to

Defendant Lee's motion to extend time, which Mr. Shochet discourteously

declined. Defendant Lee believes this lack of communication is intentional and

requests the Court ensure she is notified of all related court documents

accordingly.

The Court should also be aware that, considering the attached court decision from

the Supreme Court of Arkansas, the Florida Board of Bar Examiners has been

alerted to the appearance that Mr. Shochet may have omitted from his Florida Bar

application the information detailed in the Arkansas court decision. It is unknown

if an investigation will be undertaken or if such would impact this case.


For these reasons, and pursuant to the authority above, Defendant Lee respectfully

requests that the Court deny Plaintiffs' Motion for Leave to Amend Complaint –

To Substitute Party, or, in the alternative, require

Plaintiffs to provide a detailed explanation, a proposed amended complaint, and to

clarify that the amendment is limited solely to the substitution of Ray, and not to

introduce further changes.

Respectfully submitted,
*/s/ Lisa Lee*
*lisa.lee.legal@gmail.com*

## **CERTIFICATE OF WORD LIMIT**

Pursuant to Rule 7.1(F), N.D. Fla. Loc. R., the undersigned counsel hereby certifies

that the foregoing motion contains 2,375 words.

*/s/ Lisa Lee*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished via email on this 16th day of June 2025, to:

Respectfully submitted,
*/s/ Lisa Lee*
*lisa.lee.legal@gmail.com*

SHOCHET LAW GROUP
Attorneys for Plaintiffs
409 N. Main Street
Trenton, FL 32693
attorneys@counsel.insure
Randall Shochet, Esq.
FBN.: 959421
attorneys@counsel.insure

Cameron L. Atkinson, Esq.
Atkinson Law, LLC
Attorney For MATZKIN
1000 Lafayette Blvd., Fl. 11 Bridgeport, CT 06604
catkinson@atkinsonlawfirm.com


 Lynette Michelle Lacy Alexis Preston, pro se


John Cook, pro se


Marla Hughes, pro se


Christopher Joseph Gage, Esq.
Banker Lopez Gassler PA
Attorney for HELM
501 E Kennedy blvd, Ste 1700
Tampa, FL 33602
service-cgage@bankerlopez.com

# M Gmail

Two Lee's In A Pod <twoleespod@gmail.com>

---

## Re: Extension
2 messages

---

**Shochet Law Group** <attorneys@counsel.insure>                    Tue, May 27, 2025 at 6:50 PM
To: Two Lee's In A Pod <twoleespod@gmail.com>
Cc: Shochet Law Group <attorneys@counsel.insure>

We do not. Please reply to this email address for all future matters in this case.

Get Outlook for iOS

---

**From:** Two Lee's In A Pod <twoleespod@gmail.com>
**Sent:** Tuesday, May 27, 2025 6:28 PM
**To:** rshochet@shochetlaw.com <rshochet@shochetlaw.com>
**Subject:** Extension

May 27, 2025

Re: Case  1:25-cv-00058-RH-MJF

Dear Counsel,

Please let me know if you consent to a 30 day extension of time for my response to the amended complaint.

Thank you,
Lisa Lee

---

**Two Lee's In A Pod** <twoleespod@gmail.com>                    Fri, May 30, 2025 at 8:22 PM
To: lisa.lee.legal@gmail.com

[Quoted text hidden]



1 of 1

98-369
Supreme Court of Arkansas

# Shochet v. Arkansas Bd. of Law Examiners

335 Ark. 176 (Ark. 1998)   ·   979 S.W.2d 888
Decided Nov 19, 1998

98-369

Opinion delivered November 19, 1998

1. ATTORNEY CLIENT — ADMISSION TO BAR — STANDARD ON REVIEW. — The applicant has the burden of proving eligibility for admission to the bar of the supreme court and must do so by a preponderance of the evidence; the supreme court reviews bar admission and reinstatement cases *de novo*, and it will not reverse the findings of fact of the Arkansas Board of Law Examiners unless they are clearly erroneous. 2. ATTORNEY CLIENT — FINDINGS OF BOARD NOT CLEARLY ERRONEOUS — APPELLANT ADMITTED COMMITTING FRAUD, PERJURY, *177 and practicing dentistry on suspended license. — The findings of the Board of Law Examiners were not clearly erroneous where appellant admitted that he had committed insurance fraud and perjury, and there was evidence that he had practiced dentistry without a license; the Board properly considered this past misconduct in determining whether appellant possessed "good moral character"; the Board's determination that appellant was unable to accept responsibility for his actions was not clearly erroneous. 3. ATTORNEY CLIENT — APPELLANT FAILED TO ACCEPT RESPONSIBILITY FOR PREVIOUSLY ACKNOWLEDGED PAST MISCONDUCT — APPLICANT'S CONTINUED DENIAL OF ACT FOR WHICH HE OR SHE HAS BEEN FOUND GUILTY OR SANCTIONED IS UNACCEPTABLE. — Where appellant had not consistently maintained his innocence with respect to an unlicensed-practice charge, there was nothing that precluded the Board of Law Examiners from concluding, on the basis of appellant's testimony, that he had failed to accept responsibility for past misconduct that he had previously acknowledged and for which he had been sanctioned; an applicant's continued denial of an act for which he or she has been found guilty or sanctioned is unacceptable. 4. ATTORNEY CLIENT — ADMISSION TO BAR — EVIDENCE OF REFORM REHABILITATION IS RELEVANT TO DETERMINE APPLICANT'S PRESENT FITNESS TO PRACTICE LAW. — A fundamental rule in bar-admission cases is that evidence of reform and rehabilitation is relevant to determine an applicant's present fitness to practice law; if an applicant's behavior subsequent to the disqualifying misconduct convincingly demonstrates rehabilitation, it can overcome the adverse inference of unfitness arising from past misconduct, and if persuasive, it may support a finding of present fitness; an important aspect of "rehabilitation" is an applicant's candor about the past. 5. ATTORNEY CLIENT — ADMISSION TO BAR — BOARD'S FINDINGS THAT APPELLANT HAD GIVEN FALSE, MISLEADING, OR INCOMPLETE ANSWERS ON BOTH BAR SECURITIES LICENSE APPLICATIONS NOT CLEARLY ERRONEOUS. — On the "candor" issue, the findings of the Board of Law Examiners that appellant had given false, misleading, or incomplete answers on his bar-application character questionnaire and on his application for a securities license were not clearly erroneous;


casetext
Part of Thomson Reuters

these findings not only supplied an independent basis for the Board's decision to deny appellant's application but also demonstrated that appellant had not rehabilitated himself since the period of time in which he defrauded an insurance company, perjured himself before a state agency, and practiced dentistry on a suspended license. *178 6. ATTORNEY CLIENT — ADMISSION TO BAR — NECESSARY CHARACTERISTICS FOR ESTABLISHING CANDIDATE'S GOOD MORAL CHARACTER. — Truthfulness, honesty, and candor are necessary characteristics for establishing a candidate's good moral character and hence his or her fitness to practice law; there simply is no place in the law for a man or woman who cannot or will not tell the truth, even when his or her own interests are involved; in the legal profession, there must be a reverence for the truth. 7. ATTORNEY CLIENT — ADMISSION TO BAR — HONESTY CANDOR ARE ABSOLUTE PREREQUISITES TO ADMISSION. — An applicant must respond fully and accurately to those questions posed in an application for admission to the bar; he or she has an unremitting duty of candor to all persons charged with investigating and passing upon his or her qualifications; moreover, the attributes of honesty and candor are absolute prerequisites to the admission to the bar. 8. ATTORNEY CLIENT — ADMISSION TO BAR — BOARD'S DECISION TO DENY APPELLANT'S APPLICATION AFFIRMED. — Where the Board of Law Examiners found that appellant was less than candid in his responses to two questions on the bar-application character questionnaire and one question on his application for a securities license, the supreme court could not say that the Board's findings were clearly erroneous; the Board's decision to deny appellant's application for admission was justified on the basis of his misconduct in his dentistry practice; his failure to accept responsibility for certain aspects of that misconduct; his failure to show that he has "rehabilitated" himself since engaging in that misconduct; and his lack of candor in answering

questions on applications for professional licenses; the Board's decision denying appellant admission to the bar was affirmed.

Appeal from Arkansas Board of Law Examiners; affirmed.

*Appellant*, pro se.

*W. Frank Morledge, P.A.*, for appellee.

DAVID NEWBERN, Justice.

This is an appeal from a decision of the Arkansas Board of Law Examiners denying the application of appellant Randall Mark Shochet for admission to the Bar of this Court. Mr. Shochet has completed the necessary educational requirements, and he passed the Arkansas Bar Examination in July 1996. The Board determined, however, that Mr. Shochet failed to establish "good moral character beyond a *179 preponderance of the evidence," as required by Rule XIII of the Rules Governing Admission to the Bar, and denied his application on that basis. Mr. Shochet argues on appeal that the Board's findings and conclusions underlying its decision are clearly erroneous. We affirm the Board's decision.

Mr. Shochet attended dental school in Florida after completing his undergraduate studies in 1981. He later moved to Missouri, where, in 1986, he obtained a license to practice dentistry. In 1990, the Missouri Dental Board filed a complaint before a state administrative agency claiming that Mr. Shochet, in 1988 and 1989, had billed an insurance company for dental services he had not rendered. The Dental Board also claimed that Mr. Shochet had provided its officials with false information during their investigation of the matter and that he had committed perjury while testifying before the Dental Board.

Mr. Shochet enrolled in the St. Louis University School of Law in August 1991. In February 1992, Mr. Shochet and the Missouri Dental Board resolved the matter described above. The Dental Board abandoned its perjury charge, and Mr.

Shochet admitted he had billed an insurance company for services he had not rendered. Mr. Shochet accepted a 120-day suspension of his dentist's license commencing April 1, 1992, and running through July 29, 1992.

In March 1992, prior to the commencement of the suspension period, Mr. Shochet entered into an agreement with Dr. Glenn D. Yowell providing for Dr. Yowell to assume Dr. Shochet's dentistry practice. The agreement provided as follows:

> Dr. Shochet agrees to furnish the dental facility located at [address given], including all equipment, instruments, and supplies to Dr. Yowell in exchange for an amount to be mutually agreed upon.

> Such reimbursal will not be measured against patient fees and billings, and is not "fee splitting." It is only based on the usage of the dental office.

> Dr. Yowell is to provide his own professional liability insurance.

180   *180

> Our relationship may be terminated on either side by either giving the other three (3) weeks notice of their intention to terminate.

Mr. Shochet and Dr. Yowell signed a separate document — a letter dated March 9, 1992, and written by Mr. Shochet — that reflected further details of their arrangement. Mr. Shochet referred to Dr. Yowell as "an independent contractor Dentist" and indicated that Dr. Yowell was to "perform dental services on our patients at our office by appointments set by us Monday thru Friday or to be amended by mutual agreement." The letter revealed that Mr. Shochet would pay Dr. Yowell "the sum equal to 25% of the collections made for [his] billable services." Mr. Shochet "guaranteed" Dr. Yowell "a minimum of $3000 a month."

Mr. Shochet returned to his dentistry practice at the conclusion of the suspension period. He completed a Uniform Application for Securities Industry Registration or Transfer in April 1993 and was issued a Series 7 Securities License. Mr. Shochet sold his dental practice and, in August 1993, returned to Florida, where he worked for his father's securities business.

In November 1993, the Missouri Dental Board filed a second complaint against Mr. Shochet alleging that he had practiced dentistry during the period in which his license was suspended. The Dental Board referred to the agreement between Mr. Shochet and Dr. Yowell. It alleged that payments from patients or third parties received for work done by Dr. Yowell and a Dr. Rivera had been "deposited into a bank account which was in the name of [Mr. Shochet]"; that Dr. Yowell had been paid for his services pursuant to the agreement; and that Mr. Shochet had submitted claim forms to insurance companies and had received payment for dental work rendered during the suspended period. The Dental Board alleged that Mr. Shochet's conduct violated regulatory provisions that prohibit a suspended dentist "from receiving any compensation from any person, group practice, partnership or corporate practice, or any dental office in this state, during the period of suspension or revocation" and from accepting "fees from any capitation or third party payment program to which he might otherwise be entitled."

181   *181

Mr. Shochet resumed his legal education at the University of Miami at Coral Gables School of Law in January 1994. In October 1994, Mr. Shochet and the Missouri Dental Board resolved the matter of his alleged practice upon a suspended license. Mr. Shochet admitted the Dental Board's allegations and surrendered his Missouri dentistry license. In December 1995, Mr. Shochet completed law school and earned his Juris Doctor degree.

On May 31, 1996, Mr. Shochet applied for admission to the Bar of this Court. Mr. Shochet was allowed to take the July 1996 bar examination subject to a continuing character and fitness investigation in the event that he passed the examination, which he did. The chairman of the Board of Law Examiners was unable to determine Mr. Shochet's eligibility, and Mr. Shochet appeared *pro se* at a hearing before three members of the Board and the Board's executive secretary.

By a vote of 10-1, the Board determined that Mr. Shochet failed to establish by a preponderance of the evidence that he possessed "good moral character" and, for that reason, denied his application for admission. The Board based its conclusion on (1) the facts surrounding the suspension and surrender of Mr. Shochet's Missouri dentist's license and his explanation of that situation to the Board during the hearing; (2) Mr. Shochet's responses to questions on both the Arkansas Bar Application Character Questionnaire and the application for the Series 7 Securities License, as well as his explanation of those responses made during the hearing; and (3) evidence that, in the Board's view, demonstrated Mr. Shochet's lack of "fiscal responsibility." Mr. Shochet now seeks reversal of the Board's decision and maintains that he "established sufficient good moral character" and should be admitted to the Bar of this Court.

[1] "The applicant has the burden of proving eligibility and must do so by a preponderance of the evidence." *Partin v. Bar*, 320 Ark. 37, 41, 894 S.W.2d 906, 908 (1995). *See* Rule XIII of the Rules Governing Admission to the Bar. "We review bar admission and reinstatement cases *de novo*, and we will not reverse the findings of fact of the Board unless they are clearly erroneous." *Partin v. Bar, supra. See In re Application of* 182 *Crossley*, 310 Ark. 435, *182 441, 839 S.W.2d 1, 3 (1992). We hold that the Board's findings are not clearly erroneous and affirm its decision denying Mr. Shochet's application for admission.

## 1. The Missouri dental license

The Board's decision rested in part on its factual findings concerning the suspension and surrender of Mr. Shochet's Missouri dentist's license. As mentioned, Mr. Shochet was suspended from the practice of dentistry in Missouri based on his admission to having billed an insurance company for services not rendered. Mr. Shochet admitted his culpability as to that allegation during the hearing, and, although the Missouri Dental Board had dropped its perjury charge, Mr. Shochet further admitted in the hearing that he had indeed committed perjury before the Missouri Dental Board. The Board found that Mr. Shochet "knowingly engaged in fraud and misrepresentation by billing for services not rendered during the period of 1988-1989. Further, the applicant resorted to perjury to thwart the investigative efforts of the Missouri Dental Board."

Mr. Shochet later surrendered his dentist's license following his admission that he had practiced dentistry during the period in which his license was suspended. During the hearing before the Board, however, Mr. Shochet maintained that he had done "nothing wrong" with respect to the unlicensed-practice charge. He conceded that, "legally," he had engaged in the unlicensed practice of dentistry, but he asserted that his actions were based upon the advice of counsel. Mr. Shochet testified that he chose to admit to the Missouri Dental Board's allegations and surrender his dentist's license only because (1) he wanted to foreclose the possibility of having his license *revoked*, which he perceived as a more severe sanction; (2) he lacked the financial resources to defend the charge; and (3) he saw no "purpose" in defending the charge because he was living in Florida and attending law school there, he did not intend to use his Missouri dentist's license again, and he planned to pursue a legal and dentistry 183 practice in Florida. *183

The Board found that Mr. Shochet

now denies responsibility for practicing dentistry while his license was suspended. He avers that his actions were based upon advice from his attorneys. He also suggests that his admission of culpability was a matter of expediency and convenience.

The record shows that on January 15, 1992, prior to the beginning of the suspension period, the applicant's attorney set forth the circumstances under which the applicant could "rent" his office during the period of suspension. That letter made clear that the suspension prohibited the applicant from drawing any income from patients.

By letter of March 9, 1992, the applicant, apparently without assistance of legal counsel, entered into an agreement with Dr. Glenn D. Yowell. Through the agreement with Dr. Yowell, he (the applicant) would control appointments, billing and equipment, etc. Any sums collected which exceeded Dr. Yowell's 25% and office expenses would flow as income to the applicant.

The applicant associated Dr. Yowell as an "independent contractor" to continue receipt of patient income, contrary to the terms of his license suspension. Further, a majority of the Board gives little weight to the applicant's protestations that his arrangement with Dr. Yowell was based upon legal advice and that his admission of culpability was solely to avoid further litigation.

We cannot say that these findings of the Board of Law Examiners are clearly erroneous. Mr. Shochet admitted that he committed insurance fraud and perjury, and the Board properly considered this past misconduct in determining whether Mr. Shochet's possessed "good moral character."

It also was appropriate for the Board to take into account Mr. Shochet's practice of dentistry on a suspended license — misconduct that Mr. Shochet acknowledged in administrative proceedings in Missouri. In the hearing before the Arkansas Board of Law Examiners, however, Mr. Shochet denied responsibility for his misconduct. He asserted that his counsel had approved his plans for the operation of his dentist's office during the suspension period, and he suggested that his admission to the unlicensed-practice *184 charge was motivated, in the words of the Board, only by "expediency and convenience."

[2] The Board obviously found Mr. Shochet's explanation disingenuous. It determined that Mr. Shochet was unable "to accept responsibility for his actions," and we cannot say that determination was clearly erroneous.

Nor is the Board's finding on this point contrary to the rule established in *Florida Board of Bar Examiners re G.J.G.*, 709 So.2d 1377 (Fla. 1998); *Florida Board of Bar Examiners re M.C.A.*, 650 So.2d 34 (Fla. 1995); and *Martin B. v. Committee of Bar Examiners,* 661 P.2d 160 (Cal. 1983), which are cited by Mr. Shochet. According to those cases, an applicant should not be denied admission on account of his or her assertion of innocence regarding a charge of past misconduct where the applicant has not been found "guilty" of the charge and has consistently maintained his or her innocence with respect to it.

[3] Those cases do not assist Mr. Shochet here. Mr. Shochet has not consistently maintained his innocence with respect to the unlicensed-practice charge. He admitted the truth of the charge in proceedings before a Missouri agency and agreed to surrender his dentist's license. In the hearing before the Board of Law Examiners, however, Mr. Shochet changed his story, blamed his former attorneys, and essentially attempted to retract his prior admission of guilt. We find nothing in the cases cited by Mr. Shochet that precluded the Board from concluding, on the basis of Mr.

Shochet's testimony, that he failed to accept responsibility for past misconduct that he previously acknowledged and for which he was sanctioned. An applicant's "continued denial" of an act for which he or she has been found guilty or sanctioned "does not serve the applicant well" in bar-admission proceedings and is, in fact, "unacceptable." *Florida Board of Bar Examiners re G.J.G.*, 709 So.2d at 1381.

## 2. Candor

[4] The effect of Mr. Shochet's unlicensed practice of dentistry upon his bar application, and perhaps the effect of his commission of insurance fraud 185 and perjury, might have been *185 diminished had Mr. Shochet shown that he had undergone "successful rehabilitative efforts." *Partin v. Bar*, 320 Ark. at 45, 894 S.W.2d at 910. As the Supreme Court of New Jersey observed,

> [a] fundamental rule in bar admission cases is that evidence of reform and rehabilitation is relevant to determine an applicant's present fitness to practice law. If an applicant's behavior subsequent to the disqualifying misconduct convincingly demonstrates rehabilitation, it can overcome the adverse inference of unfitness arising from past misconduct, and if persuasive, it may support a finding of present fitness.

*Application of Jenkins*, 94 N.J. 458, 467 A.2d 1084, 1091 (1983).

As we said in the *Partin* case, however, an important aspect of "rehabilitation" is an applicant's "candor about the past." *Partin v. Bar, supra. See also Application of Jenkins*, 467 A.2d at 1091 (stating that "[o]ne particularly relevant type" of evidence that is "probative of reform and rehabilitation" is "candor before the Committee").

[5] On the "candor" issue, the Board found that Mr. Shochet had given false, misleading, or incomplete answers on his May 1996 Arkansas Bar Application Character Questionnaire and on

his April 1993 application for a Series 7 Securities License. As we cannot say the Board's findings on this point are clearly erroneous, those findings not only supply an independent basis for the Board's decision to deny Mr. Shochet's application but also demonstrate that Mr. Shochet has *not* rehabilitated himself since the period of time in which he defrauded an insurance company, perjured himself before a state agency, and practiced dentistry on a suspended license.

The Board found that Mr. Shochet was asked in Question 9(c) of the Arkansas Bar Application Character Questionnaire whether he had ever been accused of fraud. Although it is undisputed that the Missouri Dental Board had accused Mr. Shochet of insurance fraud and that Mr. Shochet had *admitted* to that misconduct, he answered "no" to Question 9(c). Mr. Shochet testified that, in consultation with counsel, he answered "no" to Question 9(c) because he concluded that the insurance-fraud matter was addressed in his 186 answer to Question 15(d), which inquired *186 whether a licensing authority had ever taken any disciplinary action against Mr. Shochet. Mr. Shochet admitted, however, that it would have been "better" to have responded "yes" to Question 9(c).

The Board also found that Mr. Shochet was asked in Question 15(a) of the Arkansas Bar Application Character Questionnaire whether he had "ever applied for a license, other than as an attorney at law, the procurement of which required proof of good moral character or examination (i.e., certified public accountant, patent attorney, real estate broker, etc.)." Although Mr. Shochet had applied for, and received, a Series 7 Securities License, and although that process required proof of "good moral character," Mr. Shochet failed to disclose the Series 7 Securities License in his answer to Question 15(a). In the hearing, Mr. Shochet acknowledged that he had failed to list the securities license, expressed regret for the omission, and said that he had "no excuse." He

then sought to justify his incomplete answer, however, by arguing that he was not really a "stockbroker."

Finally, the Board found that, in his application for the Series 7 Securities License, Mr. Shochet was asked whether any federal or state regulatory agency or foreign financial regulatory authority had ever found him to "have made a false statement or omission or been dishonest, unfair, or unethical." Again, although Mr. Shochet had admitted to the charge of insurance fraud filed by the Missouri Dental Board, he answered "no" to this question. He testified before the Board that his answer had resulted from "advice of counsel" and his misunderstanding of a "poorly worded question."

The Board found that Mr. Shochet's

> responses to the various inquiries noted above [evince] a pattern of less than full disclosure to the Arkansas Board of Law Examiners and the Securities Licensing Authority. The applicant again attempts to shift responsibility either to "advice of counsel" or his misunderstanding of poorly worded questions.

187 *187

The Board later concluded that Mr. Shochet

> has engaged in false and deceptive practices in completing the various applications for professional licenses. The instances where the applicant either chose to mislead or failed to fully inform are numerous. The initial willful fraud arose in connection with the first proceeding brought by the Missouri Dental Board in 1990. The record shows that the applicant has continued to engage in behavior which brings into question the applicant's ability to accept responsibility for his actions and his capacity for truthfulness and candor.

[6]  Truthfulness, honesty, and candor are "necessary characteristics for establishing a candidate's good moral character and hence his or her fitness to practice law." *Application of Jenkins*, 467 A.2d at 1088. There simply is "no place in the law for a man or woman who cannot or will not tell the truth, even when his or her own interests are involved. In the legal profession, there must be a reverence for the truth." *Id.* at 1091 (quoting *In re Hyra*, 15 N.J. 252, 104 A.2d 609 (1954)).

[7]  An applicant must "respond fully and accurately to those questions posed in an application for admission to the bar." *In re Ascher*, 81 Ill.2d 485, 411 N.E.2d 1, 7 (1980). He or she has an "unremitting duty of candor to all persons charged with investigating and passing upon" his or her qualifications. *Kosseff v. Board of Bar Examiners*, 475 A.2d 349, 353 (Del. 1984). "Moreover, the attributes of honesty and candor are *absolute* prerequisites to the admission to our Bar." *Id.* (emphasis added). *See also In re Green*, 464 A.2d 881 (Del. 1983); *In re Beasley*, 243 Ga. 134, 252 S.E.2d 615 (1979); *Application of Walker*, 112 Ariz. 134, 539 P.2d 891 (1975); *In re Willis*, 215 S.E.2d 771 (N.C. 1975). *See* CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 15.3.2, at p. 863 (1986).

Here, the Board found that Mr. Shochet was less than candid in his responses to two questions on the Arkansas Bar Application Character Questionnaire and one question on his application for a Series 7 Securities License. We cannot say the Board's findings are clearly erroneous. Mr. Shochet offered explanations for his answers, but we cannot say that the Board erred by finding that his explanations were not credible, as it apparently did. *188 [8] The Board's decision to deny Mr. Shochet's application for admission was justified on the basis of Mr. Shochet's misconduct in his dentistry practice in Missouri; his failure to accept responsibility for certain aspects of that misconduct; his failure to show that he has "rehabilitated" himself since engaging in that misconduct; and his lack of candor in answering

188

Shochet v. Arkansas Bd. of Law Examiners    979 S.W.2d 888 (Ark. 1998)

questions on applications for professional licenses. Because we affirm the Board's decision on the basis of these factors, it is unnecessary to discuss the Board's additional finding that Mr. Shochet displayed a lack of "fiscal responsibility."

Affirmed.

casetext
Part of Thomson Reuters



UNITED STATES CLERKS OFFC
401 SE 1ST AVE
STE 243
GAINESVILLE FL 32801

P:BROWN  S:IN          1:54B
ZONN-2192
              5218
1ZH91770U39869