1-25-CV-58-
RH/ZCB

# EXHIBIT C
## AMENDED MOTION TO DISMISS

FILED USDC FLND GV
JUL 2 '25 AM11:55



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JEREMY BRYAN HALES, et al.,
Plaintiffs,

v.

Case No.: 1:25cv58/RH/ZCB

JOHN COOK, et al.,
Defendants.

## DEFENDANT LEE'S AMENDED MOTION TO DISMISS; IN THE ALTERNATIVE MOTION FOR MORE DEFINITE STATEMENT

COMES NOW, Defendant Lisa Lee, respectfully submits her *Amended Motion to Dismiss 2nd Amended Complaint* and in the alternative *Motion for More Definite Statement*, pursuant to Federal Rule of Civil Procedure 12(b)(6), addressing [Second Amended Complaint "SAC", doc# 76] and states as follows:

## PLAINTIFF HALES' REVENUE & PROFIT LOSS

*Plaintiff's Alleged Revenue Sources are not based on loss of profit from any "product" or "service", but rather <u>Advertising Revenue</u> based on view counts for his Public Videos or <u>Paid Subscriptions</u> to View Hales' Private Life Videos [SAC ¶ 2, ¶ 5]*

Hales, known for his channel "What the Hale$" with over 730,000 subscribers, primarily earns revenue through the YouTube Partner Program (YPP) [2nd Amended Complaint, ¶ 2, doc.76]. Hales' first source of revenue comes from advertisers based on how many people view his public videos. Influencers like Hales

profit from ad revenue generated when ads are shown before, during, or after their videos. The amount of money earned depends on the number of views on his free-to-watch public videos and the level of engagement, since <u>advertisers pay</u> YouTube (Google) to place ads on popular content. YouTube then takes a portion of this revenue—typically around 45%—and pays the remaining share to the creator through AdSense. In addition to standard ad formats such as display ads, overlay ads, and skippable or non-skippable video ads, Hales earns a share of subscription fees that his audience pays by choice to watch his private life, not open for public viewing and closed to only allowing his YouTube Premium members who pay to watch this private life content [2nd Amended Complaint, ¶ 5, doc.76] . <u>Thus, Hales' does not allege losing revenue from an actual "product" or "service" as defined under F.S.A. § 672.102 leading to profit loss.</u> His profit loss is alleged to come from loss in his public video views generating revenue from advertisers or loss of his subscriptions paid by his audience for entertainment to view his private life.

To qualify for the YPP, creators must meet specific criteria: at least 1,000 subscribers, 4,000 public watch hours in the past year, reside in an eligible country, have a linked AdSense account, and comply with YouTube's monetization policies. Once accepted, a creator's earnings are directly tied to the sustained popularity of their videos; as long as their video views remain stable or grow, their profits from

advertising revenue will not decrease. Only a substantial drop in viewership would lead to a meaningful reduction in their earnings from the program.[1]

To keep high and increasing view counts to entertain and entice the public to watch his videos and subscribe to his private closed videos for entertainment, Hales, has made a practice of instigating public disputes, recording selectively edited encounters, and then casting himself as the perennial victim before a large and devoted online audience, where he then conveys to his audience that he must file lawsuits against others, while requesting his audience to make donations to his legal fees. His pattern is clear: provoke, record, and then profit—using the legal process as a mere backdrop for generating attention and financial support.

Example of Hales' publicly requesting donations for his legal fees:

 GoFundMe
https://www.gofundme.com › jeremy-george-at-whatth...  ⋮

Let's help Jeremy & George Hales with legal fees.
Mar 3, 2024 — All funds go to the Hales. Legal issue: In 2023, Jeremy filed and received a Protection Order in Ohio Court, covering them in all 50 states, ...

---

[1] "YouTube Partner Program Overview & Eligibility." *YouTube Help*, support.google.com/youtube/answer/72851?hl=en. Accessed 27 June 2025.

"Monetize with the YouTube Partner Program." *YouTube Help*, support.google.com/youtube/answer/94522?hl=en. Accessed 27 June 2025.

**August 15th, 2024** by Debbi Vaughn, Organizer

Hello friends. Here's a quick update to announce that you all have helped raise over $35,000.00 to reimburse Jeremy and George's legal fees so they can continue helping those in need and supporting causes dear to them. Thank you all for the amazing teamwork!!! In addition, some have donated directly to What The Hales and others have sent contributions to the Shochet Law Group. There is a long way to go as the Hales' legal bills have already exceeded $180,000.00 in their fight for justice and basic rights with court cases yet to be resolved. Please continue to pray for Jeremy & George, watch their videos from start to finish, and share their fundraiser on your social media accounts: https://gofund.me/3e73efec

Hugs,

Debbi Vaughn

Hales, creates thumbnails, which he alters pictures of those he targets for content, brands them with character names, and writes in attention grabbing titles, such as "Bad Neighbor in Court" "We Won In Court" "We Won Big Again", among other voluminous thumbnails designed to grab attention and sustain and grow his view counts, which increase his revenue through YPP.



BAD NEIGHBOR CALLED THE JUDGE A FOUL NAME IN COURT

76K views • 2 weeks ago



WE WON IN COURT TODAY vs BAD NEIGHBORS

90K views • 8 days ago

The Defendants in this case are not malicious conspirators; They are not market competitors. Those with channels do not engage in the type of content Hales does nor engages to drive the same demographic; the Defendant(s) are independent online commentators, who have reported on others, including Hales. Those who have reported that they do not support Hales' actions have been named in this lawsuit. Additionally, anyone who has questioned or criticized Hales' actions to gain content and Attorney's seeking to represent anyone against Hales have become subject to lawsuits and online harassment campaigns directed by Hales and broadcasted to over 730,000 members of the public who subscribe to Hales.

A recent lawsuit, out of Orange County, Florida demonstrates this pattern. When a retired attorney and mother of four merely gave an interview to someone critical of Hales, she became the target of a coordinated harassment campaign by Hales and his followers—prompted and celebrated on his channel. Content was build around her, branding her with the character name "Lips", while making false and misleading statements about her choice to retire her license to practice law in Florida. When she responded with satirical content exposing the truth of what was happening to her, Hales spun the story, presenting himself as the aggrieved victim and again mobilizing his audience against her. [Notice of Related Case, doc.70, filed 6-17-25]

The litigation before this Court is no different. Hales has weaponized the court system, turning legal filings into fodder for his videos, all while soliciting and receiving tens of thousands of dollars in donations for legal fees, under the guise of defending himself as a victim from "attacks." This is not the conduct of a wronged individual seeking justice—it is the calculated strategy of a digital provocateur exploiting the legal system for views, influence, and profit.

For these reasons, the Court should view Hales' claims with the skepticism warranted when the legal process is conscripted as a stage prop for online entertainment, rather than a forum for the resolution of legitimate grievances.

## DEFENDANT LEE'S REVENUE & ACTIONS

Defendant Lee, has operated and owned her YouTube channel since 2017, called "Two Lees in a Pod", with a subscription base of only approximately 3,600. She has branded her channel as a former heavy metal rocker promotor in the music industry, who provides free conversational entertainment open for public viewing, where she often has guests appear, whom she interviews about the latest news circulating YouTube. During her livestreams members of the public who subscribe for free to her channel, can make monetary gifts, in appreciation for her taking the time to orchestrate her livestreams. The only products ever sold on her channel are crystals, or promotional merchandise, such as t-shirts with her channel logo. When

guests have appeared, who have been harassed by Hales' for his content,

Defendant Lee's audience, has made monetary gifts to help assist them, by their

own choice, during Defendant Lee's livestreams. [SAC, doc.76 ¶ 24]

According to Hales' (SAC, doc.76, ¶23), he began experiencing a loss of

revenue in 2023. Notably, the alleged actions of Defendant Lee did not begin until

2024. This timeline alone shows that Hales' revenue decline started well before any

conduct attributed to Defendant Lee. Further, even as described in his SAC,

Defendant Lee's alleged conduct consists mainly of making numerous statements

during her livestreams. None of these statements, as alleged, directly impact the

number of views on Hales' public, ad-supported videos, nor would they reasonably

cause the public to avoid his subscription-based content, which offers access to his

private life.

In addition, Defendant Lee's livestreams are distinct in both content and

audience: she primarily entertains, interviews, and discusses various newsworthy

topics, none of which overlap or compete with the type of content from which Hales

generates revenue, which Hales'content is solely confined to storage auctions,

disputes with neighbors, and his legal battles in court. Defendant Lee does not offer

a product or service that is comparable to Hales' content or to what his subscribers

receive watching his private videos of his life. Taken together, these facts show that

there is no logical or factual basis to conclude that Defendant Lee's conduct could have caused or contributed to Hales' alleged revenue loss.

Furthermore, if one could conclude, that merely reporting on a newsworthy topic, is conspiring to scheme to take Hales' down, then any news reporter in any forum would be silenced and prevented from reporting to the public in fear of being sued for conspiracy. Reporting newsworthy topics and providing entertainment on a YouTube channel, does not constitute a "good" or "service". Thus, Hales' SAC is entirely frivolous and an egregious use of the consumer protection laws.

## FACTS ALLEGED AGAINST DEFENDANT LEE BY HALES TO SUBSTANTIATE HIS CLAIMS

1. HALES alleges he has recently needed to supplement business revenue as a result of <u>lost profits since the fall of 2023 **prior**</u> to Defendant Lee leaving as HALES moderator and engaging in HALES' allegations of LEE's scheme or any other Defendant(s) actions – HALES claims as the reason he lost profits. [¶23,TAC] Thus, all Plaintiff's allegations against LEE commence in 2024, after he alleges lost profits commencing in 2023, evidencing LEE was not the cause of his lost profits.

2. The Plaintiff's allegations against LEE in the following paragraphs are solely premised on statements of insult, opinion, and hyperbole solely about HALES conduct and person during her YouTube livestream commentary [¶26 29, ¶31, ¶33-48, TAC]

3. The remaining allegations of fraud and deception against LEE are alleged with no specificity as to what, how, when, where, LEE specifically engaged in frauding and deceiving any 3rd parties who made discretionary gifts and donations. [¶50-54TAC]

## **ARGUMENT**

### I. **PLAINTIFF FAILS TO STATE A CLAIM TO SATISFY THE ELEMENTS REQUIRED UNDER FDUPTA CLAIMS**

To state a claim for damages under the Act, a plaintiff must allege: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. Cox v. Porsche Fin. Servs., Inc., 342 F.Supp.3d 1271, 1290 (S.D. Fla. 2018).

Plaintiffs fail to meet the heightened pleading standard of Fed. R. Civ. P. 9(b). Plaintiffs allege that Defendant Lee's statements targeting HALES and Mr. HALES are likely to deceive or have actually deceived consumers, and likely to influence a consumer's purchasing decision or other commercial behavior against HALES. "[C]ourts regularly apply Rule 9(b) to FDUTPA claims," where, as here, those claims sound in fraud or deception. *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 2016 U.S. Dist. LEXIS 195735, at *10 (S.D. Fla. Feb. 16, 2016); *accord Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (applying Rule 9(b) to FDUTPA claim alleging that

defendant "caused damages through deception"); *Hauck v. Advanced Micro Devices, Inc.*, 2019 WL 1493356, at *11 (N.D. Cal. Apr. 4, 2019) (same, based on Ninth Circuit law).

Here, Plaintiffs identify no actual statements are deceptive, much less the requisite "who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the] statement, and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). Vague allegations are not sufficient. As a matter of law, statements with such vagueness cannot demonstrate that LEE deceived a reasonable consumer. "Commitment to free speech"—are "classic, non-actionable opinions or puffery" as they are "impervious to being quantifiable." 951 F.3d at 1000. Such "vague and highly subjective statements" cannot support a deception claim under FDUTPA either. *Hertz Corp. v. Accenture, LLP*, 2019 U.S. Dist. LEXIS 185373, at *12-13 (S.D.N.Y Oct. 25, 2019) (dismissing FDUTPA claim based on defendant's claim to have "the best talent in the world"); *accord Thompson v. P&G*, 2018 U.S. Dist. LEXIS 179888, at *6 (S.D. Fla. Oct. 19, 2018) (dismissing FDUTPA claim based on a representation that is "not the sort of empirically verifiable statement that [could] be affirmatively disproven"); *Perret v. Wyndham Vacation Resorts, Inc.*, 889 F. Supp. 2d 1333, 1341 (S.D. Fla. 2012)

**A. Plaintiff's SAC fails to allege Lee's engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce."**

Even taking all Hales' allegation as true, the Plaintiff's Count II, asserting a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), fails as a matter of law because Plaintiff does not plausibly allege that Lee engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8). The Plaintiff fails to allege Lee has offered "any good or service" or "any property" or any other "thing of value," as those terms are used in the "trade or commerce" provision of the statute. 681 F.Supp.2d 1356, 1377, when allegations claim Lee receives donations from viewers during her livestreams. Lee, who provides a "free" live stream open for public viewing, in which members of the public have <u>chose on their own accord</u> to make monetary gifts to Lee during her free livestreams is not a "consumer-type" transaction that "effects" the public, required to satisfy an FDUTPA claim. <u>Kelly v. Palmer, Reifler, & Assocs., P.A.</u>, 681 F. Supp. 2d 1356, 1374 (S.D. Fla. 2010). It is worth reiterating that the purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises" from "unconscionable, deceptive, or unfair acts or practices *in the conduct of* any trade or commerce." § 501.202 (emphasis supplied). The alleged acts of Lee receiving monetary gifts and donations during her free live streams—have zero connection whatsoever to any "trade or commerce." 681 F.Supp.2d 1356, 1375. The Plaintiff's SAC makes no allegation that Lee has

offered "something of value" in exchange to a monetary transaction. Thus, the Plaintiff's SAC fails to allege Lee's engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.*

FDUTPA liability requires that the defendant be involved in "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value" (Fla. Stat. § 501.203(8)).

Plaintiff's allegations admit that Lee received donations during livestreams, not as payment for any <u>good</u> or <u>service</u>, but simply as monetary gifts from viewers, as a viewer's discretion which do not constitute "trade or commerce" within the meaning of the statute. See *Macias v. HBC of Florida, Inc.*, 694 So.2d 88, 90 (Fla. 3d DCA 1997) (holding that FDUTPA does not apply where the alleged act falls outside the definition of "trade or commerce"); see also *Kelly v. Palmer, Reifler, & Associates, P.A.,* 681 F.Supp.2d 1356, 1372-73 (S.D. Fla. 2010) (finding no FDUTPA liability where defendant's conduct did not involve the provision of goods or services to a consumer).

### A. Plaintiff Lacks Causation and Standing as a Consumer or Interested Party When He Has Never Engaged in Lee's YouTube Channel

Plaintiffs cannot establish a causal link between Defendant Lee's alleged deceptions and their purported injuries. "[C]ausation is a necessary element of the FDUTPA claim," and it "'must be direct, rather than remote or speculative.'" *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015); *accord* Fla. Stat. Ann. § 501.211(1).

Lee's receipt of monetary gifts or donations during her YouTube livestreams, does not create a competitive relationship between Lee and Plaintiff, nor does it give rise to a private right of action by Plaintiff, who is neither a consumer nor an "interested party or person" under Fla. Stat. § 501.203(6). See *Kelly v. Palmer*, 681 F.Supp.2d at 1374 (recognizing that FDUTPA is designed to protect consumers, not business competitors or bystanders).

Plaintiff's own allegations confirm he derives income from YouTube Partner Program revenue based on the amount of views his free-to-watch videos receive and paid subscriptions to view his private videos about his private life. His revenue sources alleged to be affected in his SAC, have no "nexus" to any allegation against Lee's alleged deceptive statements in receipt of donations. Even is this Court takes the Plaintiff's allegations against Lee as true, receiving donations from viewers during a livestream has no connection to whether someone choses to view Hales' public free videos or paid subscriptions (TAC ¶¶ 23, 53). Furthermore, the Plaintiff provides no allegation in his SAC, that he has ever engaged in Lee's YouTube

Channel. Thus, Plaintiff fails to meet criteria to be considered a consumer when he fails to fulfill the standing requirement under the Act because he has not engaged previously in the business involved. Therefore, Plaintiff lacks standing to assert a FDUTPA claim against Lee, as he is not "affected by a violation" of the statute or "affected by an order of the enforcing authority." See Kertesz v. Net Transactions, Ltd., 635 F. Supp. 2d 1339, 1349 (S.D. Fla. 2009). *Monsanto Co. v. Campuzano,* 206 F. Supp. 2d 1252, 1269 (S.D. Fla.), <u>modified,</u> 206 F. Supp. 2d 1270 (S.D. Fla. 2002)

### B. *Fails to Allege Actual Damages*

Plaintiff further fails to allege actual damages as required under FDUTPA. Here, Plaintiff admits that his <u>alleged loss of business revenue began prior to any action by Lee</u> (TAC ¶ 23), severing any causal connection or "nexus" between Lee's conduct and Plaintiff's purported damages. Moreover, the Complaint does not allege that Plaintiff was a consumer of any good or service offered by Lee, that Lee offered the same goods or services as Hales, nor that Lee's alleged conduct directly caused Plaintiff to suffer any loss of money or property, as FDUTPA requires. See Marrache v. Bacardi U.S.A., Inc., 17 F.4th 1084, 1097 (11th Cir. 2021).

Even assuming, arguendo, that Lee's conduct constituted "trade or commerce," Plaintiff fails to allege any concrete, actual damages resulting from Lee's actions. FDUTPA requires a showing of actual damages, not speculative or

consequential losses. See *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006) Plaintiff does not allege any such loss with respect to any product or service purchased from Lee, nor does he allege any direct loss traceable to Lee's alleged conduct.

Additionally, it would be impossible to prove that Lee's conduct led to substantial decrease in Hales' free video views, leading to decrease in advertising endorsements, without bringing in at least 10,000+ witnesses to provide testimony to this Court that because of Lee's conduct they stopped watching these "free" videos. Furthermore, there is no correlation between Lee receiving monetary discretional donations during her live streams to the decrease in Hales' paid subscriptions to watch Hales' private life videos. It is illogical any allegations in the SAC against Lee directly caused Hales' alleged revenue loss that started in 2023.

Furthermore, during Hales' deposition taken 12/2/24, [Exhibit D] where he attacks an attorney deposing him with voluminous ***statements of hostility and disparagement*** [2] , mocks the Court system "***calling Judges corrupt***", and ***provides***

---

[2] **Page 275, Lines 17-19:** "You fool. You are an ignorant fool. Shut up, and listen when I'm answering your questions." **Page 277, Lines 3-5:** "Shut up, and listen. Keep your mouth shut. Gosh, for as big of a nose that you have, your mouth is even bigger." **Page 244, Lines 9-11:** "And here you are. And now you're trying to protect yourself, but it ain't going to work." **Page 248, Lines 1-2:** "Sitting on fat Lisa Lee's lap. Isn't that interesting?" **Page 250, Lines 4-6:** "Well, they definitely didn't go to fat Lisa Lee and her 'Save Harley Grace' website." **Page 243, Lines 1-2:** "They see the corruption of a judge. They see the corruption of Levy County." **Page 266, Lines 5-7:** "That's your client that says she doesn't want to be on YouTube, and yet she's on a livestream in the lap of fat Lisa Lee." **Page 271, Lines 12-14:** "not Two Lee's in a Pod that smell like cod, not two lies that you love to hang out with." **Page 273, Lines 2-4:** " Oh my goodness. What's the name of the channel, Bruce? Oh wait. I'm sorry. Deuce. What's the name of the channel deuce?"

***no specifics details on his revenue loss beyond mere generalized speculations***, it is

evidenced not only in his vague allegations of damage in his SAC and sworn

deposition transcripts, that it is impossible for him to prove damages to satisfy a

FDUPTA claim and to date, he can only speculate damage. 3

Under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),

only those plaintiffs who can demonstrate actual injury to consumers may assert

a claim when they are not themselves consumers. See Fla. Stat. § 501.204; see

also *Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach*

*County, Inc.*, 169 So. 3d 164, 169-70 (Fla. 4th DCA 2015) (holding that non-

---

3    **Page 55, Lines 24-25 & Page 56, Lines 1-5 * 18-25: Question**: "Are you capable, if your counsel were to allow you to do so, to identify the customers that you claim to have lost?" **Response**: "Yes." **Follow-up Question**: "Are you capable of identifying individuals by name?" **Response**: "Yes." **Follow-up Question**: "How many?" **Response**: "I do not know the number currently."**Follow-up Question**: "Can you give me a range?" **Response**: "We are hiring a professional to do an analysis on money lost, customers lost, and that will be presented in the Federal Court." **Question**: "When you say, 'an analysis on customers lost,' for example, are you talking about a viewer of your YouTube videos?" **Page 57, Lines 1-11: Response**: "That is one aspect. A consumer." **Follow-up Question**: "So you would claim damages as a result of a viewer of your YouTube videos that shows to no longer view your YouTube videos because of something my clients did?" **Response**: "Yes." **Follow-up Question**: "So you're going to attempt to identify all people who were your YouTube video viewers and then weren't anymore and try to correlate that with conduct of my clients?" **Page 57, Lines 22-2: Response**: "Yes, I've lost consumers due to the actions and the statements of your clients, and yes, we will identify as many as we possibly can." **Page 73, Lines 24-25: Question**: "What other contracts have been harmed interfered with by my clients?" **Page 74, Lines 1-2 Response**: "I've lost revenue in all of my business ventures due to your clients." **Page 60, Lines 3-5: Question**: "We can provide names of individuals who are not consumers anymore because of the actions and the statements of your clients." **Page 60, Lines 8: Response**: "I do not have a count."

consumer plaintiffs must allege actual injury to consumers, not just to themselves, to state a claim under FDUTPA). Federal courts have consistently followed this interpretation. See, e.g., *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218, 1223-24 (S.D. Fla. 2013).

The Middle District of Florida recently reaffirmed these requirements when it dismissed a non-consumer plaintiff's FDUTPA claim for failure to plead injury to consumers, holding that "merely postulating that consumers may be confused, as plaintiff did, is not sufficient to state a claim under FDUTPA." (Order, Middle District of Florida, April 4, 2024) Trasco Wellness, LLC, d/b/d Tampa Bay Spine and Sport, FLLC v Tampa Bay Spine & Sports Medicine, LLC, et al, 8:23-cv-02536-WFJ-UAM.

Here, Hales does not allege any actual injury to consumers, nor does he identify a single consumer who was deceived, misled, or otherwise harmed by Defendants' alleged conduct. The Second Amended Complaint (SAC) details Hales' own alleged loss of advertising revenue and paid subscriptions, but these are injuries allegedly suffered by Hales himself—not by consumers. Florida law is clear that loss of business or profits, without a concrete allegation of consumer harm, is insufficient. See *Leon v. Tapas & Tintos, Inc.*, 51 So. 3d 508, 512 (Fla.

3d DCA 2010) ("[T]he FDUTPA is intended to protect consumers, not competitors.").

Furthermore, the SAC's theory that Defendant Lee's livestream statements or fundraising practices somehow harmed Hales' audience is purely speculative. Hales does not allege facts showing that any consumer relied on or was misled by Lee's statements, nor that any consumer suffered monetary or other damages as a result. Instead, the SAC simply repeats that donations were solicited and that Hales' revenue declined. Federal pleading standards, as articulated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), require more than conclusory or speculative allegations—they require facts showing plausible entitlement to relief.

The recent Middle District of Florida decision is directly on point: allegations that "consumers may be confused" or "may be harmed" are not sufficient. Hales' failure to plead actual, concrete injury to any consumer is fatal to his FDUTPA claim as a non-consumer plaintiff. Because Hales has failed to allege any actual injury to consumers—as required by both Florida and federal law—his FDUTPA claim must be dismissed. Plaintiffs' unprecedented effort to use FDUTPA obtain an injunction compelling Defendant Lee to shut down her YouTube channel not only fails under Florida law, but is also categorically barred by the First Amendment.

Nor has Plaintiff shown that the injunction would benefit the public interest.

Indeed, there is a "significant public interest in upholding First Amendment

principles," *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir.

2002), and the proposed injunction would do the opposite

## II.    HALES' LANHAM ACT CLAIM FAILS: NO FALSE ASSOCIATION, NO FALSE ADVERTISING, AND NO STANDING TO SUE

Hales' Lanham Act claim against Lee should be dismissed because his

allegations do not satisfy the required elements for either false association or false

advertising under 15 U.S.C. § 1125(a). The statute provides causes of action for false

association—requiring use of a protectable mark likely to cause confusion as to

origin or sponsorship—and false advertising—requiring false or misleading

commercial statements about goods or services. See Parks LLC v. Tyson Foods, Inc.,

863 F.3d 220, 225–26 (3d Cir. 2017); Crystal Entm't & Filmworks, Inc. v. Jurado,

643 F.3d 1313, 1320 (11th Cir. 2011).

First, Hales does not allege that Lee used any mark, name, or symbol owned by

Hales in a manner likely to cause consumer confusion regarding origin, sponsorship,

or affiliation. See *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005); *Crystal

Entm't*, 643 F.3d at 1320. There are no facts indicating Lee used Hales' marks to

identify her own goods or services, nor any allegations of secondary meaning,

market presence, or confusion as required by law. See *Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

Second, Hales fails to state a claim for false advertising under § 1125(a)(1)(B) because he does not allege that Lee made any false or misleading statements about the nature, characteristics, qualities, or geographic origin of any product or service. The Lanham Act's false advertising provision applies only to commercial promotion or advertising, not to general criticism or personal attacks. See Parks LLC, 863 F.3d at 228–29; Tobinick v. Novella, 848 F.3d 935, 950 (11th Cir. 2017); Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Security Univ., LLC, 823 F.3d 153, 160 (2d Cir. 2016).

Lee's alleged solicitation of donations does not constitute commercial advertising of goods or services under the Act. Donations are not sales or offers for sale, and Hales does not allege that Lee competes with him in any market. See Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1141 (9th Cir. 2008).

Most importantly, Hales lacks statutory standing. Under Lexmark Int'l, Inc. v. Static Control Components, Inc., a plaintiff must fall within the "zone of interests" protected by the Act—commercial reputation or sales—and show proximate causation. 572 U.S. 118, 131–34 (2014). Hales admits his business losses predate Lee's conduct (TAC ¶ 23) and does not allege any direct diversion of sales or loss

of goodwill proximately caused by Lee's statements. See Lexmark, 572 U.S. at 133–34.

If Hales seeks to allege defamation or reputational harm, such claims are not actionable under the Lanham Act, which does not cover personal attacks or general criticism. See Tobinick, 848 F.3d at 950; Five for Ent. S.A. v. Rodriguez, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012); Lamparello, 420 F.3d at 313.

Because Hales fails to allege use of a protected mark, actionable commercial statements, injury to business interests, or commercial advertising, his Lanham Act claim must be dismissed.

## III.    NO ACTIONABLE COMMERCIAL ADVERTISING, PROTECTED COMMERCIAL INTEREST, OR FALSE REPRESENTATION

Section 43(a) of the Lanham Act protects against unfair competition and false advertising affecting commercial interests. See Lexmark, 572 U.S. at 131–32. Hales does not allege any use by Lee of his trademarks, trade dress, or protected commercial indicia in advertising or sale of goods or services. The statements at issue relate to Hales' character and conduct on social media, not to any product or service. See Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1348 (11th Cir. 2012).

The attributed statements are expressions of opinion or criticism, not false factual assertions about goods or services. See Tobinick, 848 F.3d at 950. Hales does not allege any statement suggesting confusion over product origin or quality. See 15 U.S.C. § 1125(a)(1)(A); Sovereign Military Hospitaller Order of Saint John v. Florida Priory, 809 F.3d 1171, 1181 (11th Cir. 2015).

Hales also lacks standing, as he alleges only reputational harm and diversion of donations, not lost sales due to false advertising. Lexmark requires proximate causation and a commercial interest in reputation or sales. Lexmark, 572 U.S. at 133–34. The Lanham Act does not provide a remedy for general "unfair competition" or statements unrelated to advertising of goods or services. See Tobinick, 848 F.3d at 950.

Claims for trade libel or defamation are not cognizable under the Lanham Act. See Five for Ent. S.A., 877 F. Supp. 2d at 1330. For these reasons, Hales' Lanham Act claim must be dismissed.

## IV.  LEE'S ALLEGED CONDUCT IS NOT FALSE ADVERTISING UNDER THE LANHAM ACT

Hales' claim under 15 U.S.C. § 1125(a)(1)(B) should be dismissed because the alleged conduct does not constitute "commercial advertising or promotion." The statute applies only to false or misleading statements of fact about goods or services.

See POM Wonderful LLC v. Coca-Cola Co., 573 U.S. 102, 111, 121 (2014); Crocs, Inc. v. Effervescent, Inc., 119 F.4th 1, 5–7 (Fed. Cir. 2024). Lee's statements— criticisms and allegations of personal misconduct—do not concern any product or service.

Actionable statements must be specific, measurable assertions of fact, not subjective opinion or hyperbole. See Oracle Int'l v. Rimini St., Inc., 123 F.4th 986, 1001 (9th Cir. 2024); International Code Council, Inc. v. UpCodes Inc., 43 F.4th 46, 59–61 (2d Cir. 2022). Statements like "shady," "scammer," or "stalker" are non-actionable opinions. Even accusations of "embezzlement" or "grifting" relate to personal conduct, not to any product or service.

Soliciting donations on YouTube does not constitute commercial advertising or promotion under the Lanham Act. Commercial speech must propose a commercial transaction and reference a specific product, which is not alleged here. See Tobinick, 848 F.3d at 950; Ariix, LLC v. NutriSearch Corp., 985 F.3d 1107, 1115–17 (9th Cir. 2021); Children's Health Def. v. Meta Platforms, Inc., 112 F.4th 742, 764 (9th Cir. 2024).

Hales also fails to allege economic or reputational injury caused by consumer deception. Lexmark requires plausible allegations of injury caused by the defendant's advertising. Lexmark, 572 U.S. at 131–34; Souza v. Exotic Island

Enters., 68 F.4th 99, 118–19 (2d Cir. 2023). Hales' own pleadings show any loss predated Lee's statements.

Finally, Hales and Lee are not competitors in any market for goods or services, and the alleged deception does not relate to Hales' products or services. The Lanham Act does not provide a federal cause of action for allegations of fraud or self-enrichment absent a connection to commercial advertising about goods or services. See Crocs, 119 F.4th at 7; Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 31–32 (2003).

Accordingly, Hales' Lanham Act claim should be dismissed with prejudice.

## V.    FAILURE TO STATE A CLAIM FOR CIVIL CONSPIRACY AGAINST LEE

Under Florida law, to state a claim for civil conspiracy, a plaintiff must allege: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy. See *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). Furthermore, "an actionable conspiracy requires an actionable underlying tort or wrong," unless the plaintiff can show "some peculiar power of coercion possessed

by conspirators by virtue of their combination, which individual acting alone does not possess." Id. at 140-41.

Hales claims, in conclusory fashion, that "LEE and all Defendants agreed to intentionally participate in a civil conspiracy among themselves" to violate Florida's Deceptive and Unfair Trade Practices Act, the Lanham Act, and to commit tortious interference (¶211). Yet, the only specific conduct attributed to Lee consists of hosting livestreams, interviewing guests (including other defendants), and making statements critical of Hales (¶¶26, 29, 31, 33-54, 50-54). Nowhere does Hales allege facts showing that Lee and the other defendants actually entered into an agreement or had a "meeting of the minds" to accomplish any unlawful purpose. Florida courts have repeatedly held that "[a] conclusory allegation of agreement, without more, is insufficient." *Schmidt v. Wells Fargo Bank, N.A.*, 240 So. 3d 786, 791 (Fla. 1st DCA 2018).

The Complaint's factual allegations reveal that Lee's conduct is limited to her operation of a YouTube channel, where she livestreams, interviews others, and discusses newsworthy topics, including her opinions about Hales and his business practices (see ¶¶26, 28-31, 33-54). The statements Lee made, while critical or even harsh, are not themselves unlawful acts, nor do they constitute "unlawful means" under Florida or federal law. The First Amendment protects commentary, opinion,

and even sharp criticism about matters of public concern. See *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011); *Silvers v. Discombe*, 970 So. 2d 892, 894 (Fla. 4th DCA 2007).

Paragraphs 26, 29, 31, and 33-54 simply recount Lee's statements and livestream activity, none of which allege any overt act in furtherance of an unlawful conspiracy. The fact that Lee's guests included others who have been criticized by Hales (¶54), or that Lee accepted voluntary donations from viewers (¶¶50-53), does not transform her conduct into a conspiratorial act. There is no factual allegation that Lee or her guests took any action—beyond public speech or commentary—that would satisfy the overt act requirement for civil conspiracy.

Hales alleges that his revenue decline began in 2023, "prior to Defendant Lee leaving as Hales moderator and engaging in Hales' allegations of Lee's scheme or any other Defendant(s) actions" (¶23). Lee's alleged conduct began in 2024 (¶26). There are no facts connecting Lee's livestreams or interviews to any actual loss of business, subscribers, or revenue for Hales. Mere correlation is not causation, and Hales fails to plead any facts showing that Lee's conduct resulted in compensable damages.

A civil conspiracy claim cannot stand without an actionable underlying wrong. See *Walters*, 931 So. 2d at 140. As argued above, Hales fails to allege facts

sufficient to state a claim for tortious interference, a violation of FDUTPA, or a violation of the Lanham Act against Lee. The Complaint does not allege that Lee made any commercial misrepresentations in advertising under the Lanham Act, nor does it allege that Lee sold any goods or services or engaged in "trade or commerce" as required by FDUTPA (see ¶24, describing Lee's channel and its lack of comparable products or commercial competition with Hales). Voluntary donations to a livestreamer do not constitute consumer transactions under the statute. See *Kelly v. Palmer, Reifler, & Associates, P.A.*, 681 F. Supp. 2d 1356, 1373 (S.D. Fla. 2010) (donations not actionable under FDUTPA).

Hales does not allege, even in conclusory terms, that Lee and the other defendants possessed any "peculiar power of coercion" by virtue of their combination, nor that any such power was exercised against Hales or any third party.

Florida's anti-SLAPP statute, Fla. Stat. § 768.295, prohibits lawsuits brought primarily to silence or intimidate individuals for exercising their right to free speech on matters of public concern. Lee's livestreams, interviews, and commentary fall squarely within the protections of both state and federal law. See *Cummings v. Dawson*, 444 F. Supp. 3d 1283, 1293 (M.D. Fla. 2020).

Because Hales alleges nothing more than that Lee hosted livestreams and interviewed individuals about their experiences with Hales—conduct fully protected

by the First Amendment and insufficient as a matter of law to state a claim for civil conspiracy—Count 6 should be dismissed. There are no well-pleaded facts supporting the existence of an agreement, unlawful act, overt act in furtherance, damages, or any actionable underlying wrong. Hales' allegations are precisely the sort of conclusory, speculative, and retaliatory claims that Florida and federal law do not permit.

## VI.  FAILURE TO STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS (LEE)

Under Florida law, a cause of action for tortious interference with a business relationship requires: (1) the existence of a business relationship; (2) knowledge of that relationship by the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the

While malice is required for tortious interference (*Rockledge Mall*, 779 So. 2d at 557), Hales does not allege facts showing Lee acted with the requisite malice toward any specific business relationship. The Complaint describes Lee's conduct as commentary, criticism, or fundraising for third parties, none of which is alleged to be motivated by a desire to harm Hales' existing business relationships.

Lee and Hales are not business competitors, and Lee's YouTube activity is not alleged to target Hales' advertisers, business partners, or customers (see factual

summary, "Defendant Lee's Revenue & Actions"). Federal law, including Section 230 of the Communications Decency Act, preempts claims based on content posted by users on interactive computer services, further undermining Hales' claim. See 47 U.S.C. § 230(c)(1).

For all these reasons, Hales fails to allege facts sufficient to state a claim for tortious interference with a business relationship against Lee under Florida or federal law. The Complaint does not identify a specific business relationship interfered with, fails to allege direct and intentional interference, does not show lack of justification or privilege, and lacks any factual basis for causation or malice. Accordingly, Count 4 should be dismissed as a matter of law.

## VII.  LACK OF PROPER SERVICE DEPRIVES THIS COURT OF JURISDICTION OVER DEFENDANT LEE

Federal Rule of Civil Procedure 4(c) mandates that a summons and a copy of the complaint must be served upon each defendant. See Fed. R. Civ. P. 4(c)(1). It is well established that "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). In this case, Defendant Lee was only served with the original Complaint, which contained claims of Defamation that were subsequently removed in the Amended and Second Amended Complaints. Defendant Lee was never served with the First Amended

Complaint, to which the Second Amended Complaint was derived from which materially alters the claims therein, as required by Rule 5(a)(2), which provides that "[a] pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4."

Because Plaintiff did not effectuate formal service of the First Amended Complaint and the Second Amended Complaint upon Defendant Lee was derived from the First Amended Complaint, this Court lacks personal jurisdiction over her as to any claims derived from those pleadings. See *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) ("[S]ervice of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant."). Any claims or relief sought in the Second Amended Complaint are not properly before this Court as against Defendant Lee.

Accordingly, Defendant Lee respectfully requests that the Court dismiss all claims asserted in the First and Second Amended Complaints for lack of personal jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5)

WHEREFORE, Defendant LEE requests this Court to the following:

(1) GRANT this Amended Motion to Dismiss

(2) Dismiss the claims against Defendant LEE with Prejudice

(3) If the Court does not grant this motion, then direct the Plaintiff to amend his complaint adding specificity to the dates, times, specifics, to his allegations against Defendant LEE

(4) All other remedies necessary and just under statute.


## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

I certify this memorandum contains 6, 710 words.

*/s/ Lisa Lee*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronically through the Clerk of Court using CM/ECF to all parties and the Defendant served the Plaintiff via Mail and email on this 27th day of June 2025, to:

SHOCHET LAW GROUP
Attorneys for Jeremy B. Hales
409 N. Main Street
Trenton, FL 32693
By: /s/ Randall Shochet
Randall Shochet, Esq.
FBN.: 959421
attorneys@counsel.insure

Respectfully submitted,

<u>/s/ Lisa Lee</u>
2518 Burnsed Blvd.
Ste. 338
The Villages, FL 32163
386-259-0598