1-25-cv-58
RH/ZCB

# EXHIBIT D

## JEREMY B. HALES DEPOSITION DATED 12-2-24

FULL TRANSCRIPT CAN BE FOUND IN: Case 1:24-cv-00045-ZCB Document 42-1 Filed 12/06/24

FILED USDC FLND GV
JUL 2 '25 AM 11:56

1   ==sitting on fat Lisa Lee's lap.  Isn't that==
2   ==interesting?==  With no face mask.
3            Oh, we also have she's going to get
4   spanked in the mouth.  We also have all the
5   witnesses of actual people seeing Lynette
6   hitting her in the head.  We have -- I mean,
7   the list goes on and on.  Nails.  Glass.
8   "She's going to die from this.  She's going to
9   die from that."
10           The extreme conditions are un- --
11  unfavorable for a child, especially one that
12  somehow, someway has a life-threatening
13  disease.
14       Q.   So why would, to your understanding,
15  the biological aunts contact you about the
16  child's living conditions and dangers that
17  she's in?
18       A.   I don't know.  What about Lynette
19  posting that she moved out of the trailer to
20  get away from John Cook, to get Harley Grace
21  away from John Cook?
22           You know, this is your client's own
23  posting saying about the person that she's
24  living with with this child.  That's your
25  client.

```
 1  you were the one that they saw willing to stand
 2  up to Lynette Preston, and so they contacted
 3  you for help about the child; correct?
 4       A.   Well, they definitely didn't go to
 5  fat Lisa Lee and her "Save Harley Grace"
 6  website.  Oh.  You know, the one where they
 7  state that they're PR for Lynette, they're the
 8  mouth piece for your client?  That one.  Yeah.
 9  You know about that.
10            So they contacted me because they
11  care.  Would you be quiet and listen to my
12  answers?
13            They contacted me because they love
14  that child.  They contacted me because they
15  care about that child.  They contacted me
16  because they're in fear for that child's life
17  every single day around your clients.
18            They contacted me because of the --
19  because of the verbal abuse.  They contacted me
20  because of the physical abuse.  They contacted
21  me -- now, these are my beliefs.  I can't
22  answer the question for them why they contacted
23  me.  But I bet you're going to have an
24  opportunity to be in court to ask them.
25       Q.   Okay.  Now --
```

1  system.  ==They see the corruption of a judge.==
2  ==They see the corruption of Levy County.==  They
3  see what being stalked on YouTube is like, the
4  hell that we've had to go through.  And you
5  don't think they're going to learn from that
6  process?  You don't think they're going to
7  learn, "Oh, this is how to justice system
8  works?  Oh, this is how it doesn't work?  Oh,
9  this is how -- this is what's going on?"
10             This is how I protect myself.  This
11  is the most important thing for anybody online,
12  an online personality, is security, security,
13  security, security, or this is going to happen
14  to you, as well.
15             Oh, that's right.  They said that I
16  am a child rapist, that I raped their daughter.
17  How would you respond if they said that about
18  you because you're probably next on their list?
19  How are you going to respond when they put up
20  in your community?  How are you going to
21  respond when they start saying that on your
22  reviews online?  How are you going to respond
23  when these individuals say they're going to
24  shoot you in the face and feed you to gators?
25             This is a learning process and an

Case 1:25-cv-00043-ZCB Document 42-187 Filed 12/06/24 Page 267 of 330
Case 1:25-cv-00043-ZCB Document 1-187 Filed 02/25 Page 5 of 16

JEREMY B. HALES  
DECEMBER 02, 2024

JOB NO. 1278527

```
 1   on Channel 20.  That's your client at town
 2   hall.  That's your client in all these public
 3   records.  That's your client in court who says
 4   she doesn't want anything to do with this.
 5   That's your client that says she doesn't want
 6   to be on YouTube, and yet she's on a livestream
 7   in the lap of fat Lisa Lee.
 8           That's your client who wants to have
 9   my channel removed under your direction in your
10   "Anti What the Hales ecosystem."  Your client
11   is a public figure.
12       Q.   Okay.  Now, is it because of her
13   status as a public figure that you feel it's
14   okay to do so many videos focused on her and
15   her property condition and the safety of her
16   child and calling for the child to be removed?
17           Is it because of her status as a
18   public figure that you feel that it's okay for
19   you to do that?
20       A.   Excuse me.  What?  The channel name
21   is "What the Hales."  It's not "What the
22   Lynette."  It's not "What the Crook."  It's
23   "What the Hales."
24           This is the story of my life and how
25   they invaded my life, how they came, and they
```

Case 1:25-cv-00053-RCB-ZCB Document 187-5 Filed 07/02/25 Page 6 of 16
Case 1:24-cv-00045-RCB-ZCB Document 142-1 Filed 12/06/24 Page 272 of 316

JEREMY B. HALES
DECEMBER 02, 2024
JOB NO. 1278527

```
 1   their lives.
 2           And when I see things such as
 3   despicable living conditions, when I see
 4   backwards -- literally backwards developmental
 5   in a child, when I see individuals coming
 6   forward who originally, initially, actually
 7   believed Lynette but now who are coming forward
 8   to protect a child, it's their responsibility,
 9   as well.
10           When the truth is actually shared,
11   which is what I do on What the Hales, actual
12   truth, not Two Lee's in a Pod that smell like
13   cod, not two lies that you love to hang out
14   with.
15           And yet you know what?  You're
16   talking about the timeline.  All of the sudden,
17   you know that you're incriminating yourself
18   within these lawsuits, and now you're absent.
19   Oh, but you're still posting, calling people,
20   you know -- let's see -- morons, idiots.
21           You're the most unprofessional
22   lawyer I've ever witnessed in my life, and
23   frankly, you're the best lawyer I've never had
24   to pay in my life because you literally
25   incriminate your clients and yourself over and
```

```
 1        Q.    -- and this proceeding?
 2        A.    Oh, my goodness.  What's the name of
 3   the channel, Bruce?  Oh, wait.  I'm sorry.
 4   Deuce.  What's the name of the channel, deuce?
 5   What is it?  Is it "What the child"?  What's
 6   the name of the channel?
 7        Q.    But it's not your child.
 8        A.    Say it.
 9        Q.    Why was it --
10        A.    Say it.
11        Q.    -- your responsibility?
12        A.    Say the name of the channel.
13        Q.    It wasn't a relative of yours.  Why
14   would you take it on your responsibility --
15        A.    Say the name of the channel.
16              THE REPORTER:  Please wait for
17   him to finish his question, Mr. Hales.  Please.
18              THE WITNESS:  Yes, ma'am.
19   Alyssa, I apologize that you're a part of this.
20   BY ATTORNEY MATZKIN:
21        Q.    So why was -- why did you take it on
22   as your responsibility to devote your YouTube
23   content to a campaign of saving the child by
24   having her removed?
25        A.    My YouTube content is my life.  Your
```

```
 1   answer.  Is it being videotaped, to your
 2   knowledge?
 3         A.     Here's the answer:  This is my life.
 4         Q.     Just --
 5         A.     There is no YouTube personality.
 6   There is no YouTube content.  This is my life.
 7   No matter if I'm in a storage unit, no matter
 8   if I'm cutting down trees on my property, no
 9   matter if I'm being stalked by your clients, my
10   life gets videoed and shared.  My life.  Not
11   yours that you have now invaded my life, as
12   well, and now you're worried that it's being
13   videoed?  You're worried that -- you're worried
14   it's going to be videoed?
15              You're the one that literally has
16   posted publicly that you can't wait to depose
17   me.  You fool.  You are an ignorant fool.  Shut
18   up, and listen when I'm answering your
19   questions.
20              ATTORNEY SHOCHET:  Hold on a
21   second.  Just -- I'm getting a -- in my upper
22   right corner, it says "recording."  And I'm not
23   recording it, and I hope you're not, sir.
24   Well, I see a red light.  It says "recording."
25   I'm going to take a screenshot of it.
```

Case 1:25-cv-00053-RCB-ZCB  Document 42-187  Filed 12/06/24  Page 278 of 320
Case 1:25-cv-00053-RCB-ZCB  Document 187-5  Filed 07/02/25  Page 9 of 16

JEREMY B. HALES                                    JOB NO. 1278527
DECEMBER 02, 2024

```
 1     Q.     Are you --
 2     A.     -- if it's being recorded?
 3            Shut up, and listen.  Keep your
 4  mouth shut.  Gosh, for as big of a nose that
 5  you have, your mouth is even bigger.
 6            Listen.  You're the one that's out
 7  there telling everybody you can't wait to
 8  depose me, and yet here you are cowering like a
 9  little child.  You're whining at the beginning,
10  "I don't want to record it."  Now you're -- now
11  you're whining more about recordings.
12            What's wrong?  Are you feeling
13  guilty?  You feeling like you haven't taken up
14  your responsibilities and done the right thing
15  for your clients and for yourself?  All of a
16  sudden, you got a moral compass?
17            The recording makes no difference
18  whatsoever.  There is no gag order.  There is
19  no court order.  And there's you publicly
20  stating you can't wait to depose me.  There's
21  young publicly stating that the deposition is
22  going to be online on Two Lee's.  There's you
23  stating all these things.
24     Q.     So the question, again, is:  Other
25  than the backup recording by Steno, are you
```

```
 1   educational process for anybody and everybody
 2   out there.  And you would think that you would
 3   be smart enough -- I don't know how in the
 4   world you passed the Bar -- but you would be
 5   smart enough to know that that's the process in
 6   the first place and to know that you just threw
 7   in your hat with some people that are extremely
 8   dangerous.
 9              And here you are.  And now you're
10   trying to protect yourself, but it ain't going
11   to work.  And yet I'm protecting myself by
12   information out on the web.
13        Q.   Do you recall that Judge Davis said
14   he didn't want to see this on YouTube on
15   September 4th when Ms. Preston dismissed the
16   State Court temporary restraining order against
17   you?
18              Do you recall Judge Davis saying
19   that?
20        A.   Judge Davis never said that.
21        Q.   And do you acknowledge that that
22   night you specially made a YouTube broadcast --
23   a YouTube video bragging about winning -- "I
24   Won in Court" being the headline?
25        A.   Again, Judge Davis never said that,
```

```
 1               ATTORNEY MATZKIN:  He can
 2   either answer it or say he doesn't understand
 3   the question, and I can rephrase it.  You
 4   can --
 5               ATTORNEY SHOCHET:  Well, I'm
 6   going to object and instruct him not to answer
 7   if you're -- I don't know what you're -- if
 8   you're asking for names, you do not give out
 9   names or anything confidential from your
10   confidential customer list.
11               ATTORNEY MATZKIN:  That's an
12   improper instruction because it's
13   (indecipherable) --
14               ATTORNEY SHOCHET:  No, it's
15   not.  You can go ahead with the Court.  It's
16   confidential.  I'm objecting.  You're not going
17   to get his names because you're asking for
18   confidential information.
19   BY ATTORNEY MATZKIN:
20       Q.    Is it your allegation that you have
21   lost customers due to the conduct of my client?
22   Yes or no?
23       A.    Yes.
24       Q.    Are you capable, if your counsel
25   were to allow you to do so, to identify the
```

1 customers that you claim to have lost?
2    A.  Yes.
3    Q.  And are you capable of identifying
4 individuals by name?
5    A.  Yes.
6    Q.  So to be clear, when you're talking
7 about customers you've lost, you're talking
8 about individuals?
9    A.  To be clear, "customers" is plural,
10 meaning more than one, made up of individual
11 persons.
12    Q.  Again, my question is: Are you able
13 to identify individual persons that were
14 customers that you lost?
15        Yes or no?
16    A.  Again, as you've already asked this
17 question, yes.
18    Q.  How many?
19    A.  I do not know the number currently.
20    Q.  Can you give me a range?
21    A.  We are hiring a professional to do
22 an analysis on money lost, customers lost, and
23 that will be presented in the Federal Court.
24    Q.  When you say, "an analysis on
25 customers lost," for example, are you talking

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

1  about a viewer of your YouTube videos?
2       A.   That is one aspect.  A consumer.
3       Q.   So you would claim damages as a
4  result of a viewer of your YouTube videos that
5  shows to no longer view your YouTube videos
6  because of something my clients did?
7       A.   Yes.
8       Q.   So you're going to attempt to
9  identify all people who were your YouTube video
10 viewers and then weren't anymore and try to
11 correlate that with conduct of my clients?
12           ATTORNEY SHOCHET:  Objection
13 to form.
14           You can answer.
15           THE WITNESS:  The conduct of
16 your client that calls me a child rapist; the
17 conduct of your client that states that I raped
18 their child; the conduct of your client that
19 states that we're opening a terrorist training
20 ground in the old schoolhouse; the conduct of
21 your client that -- I can go on and on and on.
22           Yes, I've lost consumers due to the
23 actions and the statements of your clients, and
24 yes, we will identify as many as we possibly
25 can.

```
 1   questions.  But I will do my best to give you
 2   an actual good answer.
 3              We can provide names of individuals
 4   who are not consumers anymore because of the
 5   actions and the statements of your clients.
 6       Q.     And how many such individuals are
 7   you able to identify?
 8       A.     I do not have a count.
 9       Q.     Is it under a hundred?
10       A.     I do not have a count.
11       Q.     And for any given such individual,
12   how is it that it causes you damage if they no
13   longer watch YouTube -- you on YouTube?
14       A.     Again, a judge and answer a jury
15   will determine damages, not me.  I'm a
16   layperson.
17       Q.     All right.  In Paragraph 79 -- you
18   ready?
19              ATTORNEY SHOCHET:  Not yet.  I
20   told you we're getting there.  Mouse is a
21   little slow.  Okay.  Okay.
22   BY ATTORNEY MATZKIN:
23       Q.     It says, "Despite knowledge of the
24   customer," singular, "contractual, and business
25   relationship with Hales, Cook intentionally and
```

Case 1:24-cv-00645-RJC-CB   Document 47-3   Filed 12/06/24   Page 74 of 320
Case 1:24-cv-00645-RJC-CB   Document 42-17-3   Filed 07/02/25   Page 15 of 16

JEREMY B. HALES                                              JOB NO. 1278527
DECEMBER 02, 2024

```
 1              Again, I've lost revenue on all
 2   aspects of my businesses.
 3   BY ATTORNEY MATZKIN:
 4        Q.    So I'm going to try one more time.
 5              Are you claiming that you have lost
 6   revenue from Olight from -- due to my clients?
 7   Just Olight.
 8        A.    Again, I have lost revenue in all of
 9   my business endeavors.
10        Q.    Okay.  How would you earn revenue
11   from Olight?
12        A.    None of your business.
13        Q.    So you're claiming that you lost
14   revenue from Olight due to my clients; right?
15        A.    Do you want me to go over this
16   again?
17        Q.    So how does the revenue work with
18   Olight?
19        A.    None of your business.
20        Q.    Okay.  What about -- you mentioned
21   past, present, and future contracts.  So we
22   went over some social media contracts,
23   Facebook, TikTok, Whatnot, and now Olight.
24              What other contracts have been
25   harmed interfered with by my clients?
```

```
 1        A.    I've lost revenue in all of my
 2   business ventures due to your clients.
 3        Q.    Okay.  But I'd like to have
 4   individual name of the companies or other
 5   identifying aspect of the contracts.
 6        A.    Decreased income.
 7        Q.    No, no.  I mean the other party to
 8   the contracts that you're saying were harmed or
 9   affected?
10              ATTORNEY SHOCHET:  Objection
11   to form.  You've asked and answered it, but
12   have at it.
13   BY ATTORNEY MATZKIN:
14        Q.    So imagine you have a pile of
15   contracts in paper form in front out of all
16   your business contracts.  I'd like you to pull
17   out, figuratively, the ones that you claim were
18   harmed or interfered with by my clients and
19   tell me the name on them.
20              ATTORNEY SHOCHET:  Objection
21   to form.
22              You can answer.
23              THE WITNESS:  Again, my income
24   has decreased due to your clients, what they
25   have said, what they have done, their actions
```